1

Honorable Benjamin H. Settle

2

3

4

5

6

7

8
### UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF WASHINGTON
9
### AT TACOMA

10   BRADLEY BOARDMAN, a Washington
Individual Provider; DEBORAH
11   THURBER, a Washington Family
Childcare Provider; SHANNON BENN, a
12   Washington Family Childcare Provider;
and FREEDOM FOUNDATION, a
13   Washington nonprofit organization,

14                     Plaintiffs,

15           v.

16   GOVERNOR JAY INSLEE, Governor of
the State of Washington; PATRICIA
17   LASHWAY, Director of the Washington
Department of Social and Health Services
18   ("DSHS"); and ROSS HUNTER, Director
of the Washington Department of Early
19   Learning ("DEL"),

20                     Defendants,

21           and

22   CAMPAIGN TO PREVENT FRAUD
AND PROTECT SENIORS,
23
                     Intervenor-
24                     Defendant.

25

26

Case No. 3:17-cv-05255-BHS

PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT

NOTE ON MOTION CALENDAR:
AUGUST 10, 2018

ORAL ARGUMENT REQUESTED

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1

# TABLE OF CONTENTS

2

**Page**

3    I.    RELIEF REQUESTED...................................................................................... 1

4    II.   BRIEF SUMMARY......................................................................................... 1

     III.  EVIDENCE REPLIED UPON ......................................................................... 3

5    IV.   FACTUAL BACKGROUND ............................................................................ 3

6          A.    IPs, Identity of Parties, and Related Entities.......................................... 3

7                1.    IPs and Their *Harris* Rights ................................................... 3

                 2.    Plaintiffs ................................................................................ 4

8                3.    Defendants ............................................................................. 5

9                4.    Intervenor Campaign ............................................................. 5

10         B.    Unions' Early Efforts to Quash Plaintiffs' PRA Rights........................... 6

           C.    Creation and Impact of I-1501 ............................................................. 6

11               1.    Only Effective Change Was to Keep Non-preferred Entities and
12                     Individuals Such as Plaintiffs from Learning the Names of the IPs .......... 7

13               2.    Carve-outs from Prohibitions for Disclosures: Yes for the Unions;
                       No for Plaintiffs ..................................................................... 7

14               3.    No Evidence of any Identify Theft  Related to PRRs .............................. 7

                 4.    Plaintiffs' Efforts After Passage of I-1501 ................................ 8

15         D.    Campaign and Unions: "Vote for I-1501 to Stop the Foundation."....................... 9

16               1.    Campaign Communications .................................................... 9

                 2.    Union Communications .......................................................... 9

17         E.    Governor Knows Real Intent of I-1501 to Stop the Foundation......................... 11

18         F.    Open Availability of Detailed Voter Registration Lists Demonstrates That
19               Adequate Steps Short of Total Bar Exist ............................................... 11

     V.    ISSUES PRESENTED..................................................................................... 12

20   VI.   ARGUMENT ................................................................................................ 13

21         A.    Defendants are Interfering with Plaintiffs' Fundamental Rights and I-1501
                 Does Not Pass Strict Scrutiny ............................................................. 13

22         B.    Refusing to Provide Identity of the IPs Effectively Precludes Plaintiffs'
23               Access to the IPS ................................................................................ 14

24               1.    Plaintiffs Seek to Utilize Modes of Communication, Long
                       Recognized as Venerable by the Supreme Court..................................... 14

25               2.    Barring Access to an Audience is Unconstitutional, Even if
                       Content Neutral and Enacted for Legitimate Reasons............................ 15

26

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - i
(Case No. 3:17-cv-05255-BHS)

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 $$ F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

**TABLE OF CONTENTS**
(continued)

Page

3.   Refusing to Provide the Names of the IPs is the Constitutional Equivalent of Barring Access to a Neighborhood or Knowledge of Who Were Voters ................................................................. 17

C.   IPs' First Amendment Right to Receive Information ........................................... 18

D.   The PRA Provisions of I-1501 are Facially Overbroad ....................................... 20

E.   I-1501 Violates the IPs Freedom of Association Rights ....................................... 21

F.   I-1501 Violates the Equal Protection Clause ....................................................... 21

G.   I-1501 Was Motivated By Animus ....................................................................... 22

H.   Plaintiffs are Entitled to Their Attorney Fees ...................................................... 23

VII.   CONCLUSION ................................................................................................................. 23

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - ii
(Case No. 3:17-cv-05255-BHS)

**MILLER NASH GRAHAM & DUNN LLP**
ATTORNEYS AT LAW
T: 206.624.8300 $$ F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

1

# TABLE OF AUTHORITIES

2

**Cases**

3

*Arcara v. Cloud Books, Inc.,*

4
    478 U.S. 697 (1986) ...................................................................................................23

5

*Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. ...................................26

6

*Bullock v. Carter,*

7
    405 U.S. 134 (1972) ...................................................................................................17

8

*Carey v. Brown,*
    447 U.S. 455 (1980) ............................................................................................. 24, 25

9

*City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432 (1985) ....................................................25

10

*City of Ladue v. Gilleo,*

11
    512 U.S. 43 (1994) ..................................................................................................19, 20

12

*City of Lakewood v. Plain Dealer Pub. Co.,*

13
    486 U.S. 750 (1988) .................................................................................................23, 24

14

*Eu v. San Francisco Cnty. Democratic Cent. Comm.,*
    489 U.S. 214 (1989) ...................................................................................................24

15

*Fowler Packing, Inc. v. Lanier,*

16
    844 F.3d 809 (9th Cir. 2016) ......................................................................................26

17

*Harris v. Quinn,*
    134 S. Ct. 2618 (2014) ........................................................................4, 5, 7, 8, 9, 17

18

*Houchins v. KQED, Inc.,*

19
    438 U.S. 1 (1978) ......................................................................................................16

20

*Martin v. City of Struthers, OH,*

21
    319 U.S. 141 (1943) .........................................................................................18, 19, 22, 23

22

*Meyer v. Grant,*
    486 U.S. 414 (1988) ............................................................................................. 16, 17

23

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue,*

24
    460 U.S. 575 (1983) ............................................................................................. 23, 24

25

*Police Dept. of City of Chicago v. Mosley,*

26
    408 U.S. 92 (1972) .............................................................................................16, 24, 25

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

*Red Lion Broadcasting Co. v. FCC*,
   395 U.S. 367 (1969)................................................................................ 22, 23

*Reed v. Town of Gilbert*,
   135 S. Ct. 2218 (2015)....................................................................................17

*Richmond Newspapers, Inc. v. Virginia*,
   *448 U.S. 555* (Brennan, J. concurring with the plurality) ...........................17

*Romer v. Evans*,
   517 U.S. 620 (1996)..................................................................................25, 26

*Schneider v. State of New Jersey, Town of Irvington*,
   308 U.S. 147 (1939)..................................................................................18, 19

*SEIU 775 v. Freedom Found.*,
   193 Wn. App. 377 (2016) ................................................................................9

*Stanley v. Georgia*,
   394 U.S. 557 (1969)......................................................................................22

*State Emp. Bargaining Agent Coal. v. Rowland*,
   718 F.3d 126 (2d Cir. 2013)..........................................................................24

*Thomas v. Collins*,
   323 U.S. 516 (1945)................................................................................22, 24

*U.S. Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973).......................................................................................26

*U.S. v. Stevens*,
   559 U.S. 460 (2010).......................................................................................23

*Washington v. Davis*,
   426 U.S. 229 (1976).......................................................................................26

*Washington v. Seattle School Dist. No. 1*,
   458 U.S. 457 (1982).......................................................................................26

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) (per curiam)..................................................26

*Williams v. Rhodes*,
   393 U.S. 23 (1968).........................................................................................24

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

4833-6815-9849.4

**Statutes**

42 U.S.C. §§ 1983, 1998(b) ................................................................................................27

RCW 41.56.070 ...................................................................................................................7

RCW 42.56.230(1) - (3) ....................................................................................................10

RCW 42.56.250(4) .............................................................................................................10

RCW 42.56.640-.645 ...........................................................................................................4

RCW 42.56.645(1)(d), (g) .................................................................................................10

RCW 43.17.410 ................................................................................................................4, 5

**Other Authorities**

First Amendment ..................................................4, 5, 7, 15, 16,17, 18, 19, 20, 22, 23, 25

First and Fourteenth Amendments.....................................................................................24

U.S. Constitution Equal Protection Clause ..........................................................................4

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - v
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON 98121

4833-6815-9849.4

# I.   RELIEF REQUESTED

Pursuant to Fed. R. Civ. Proc. 56, Plaintiffs Bradley Boardman ("Boardman"), Deborah Thurber ("Thurber"), Shannon Benn ("Benn"), and Freedom Foundation ("the Foundation") (collectively, "Plaintiffs") move for summary judgment that §§ 2(3), 7-11 of Initiative 1501 (now codified at RCW 42.56.640 -.645, and RCW 43.17.410) violate the First Amendment and the Equal Protection Clause of the U.S. Constitution.  Plaintiffs seek an order (a) enjoining enforcement of RCW 42.56.640-.645, and 43.17.410, (b) requiring Defendants within two weeks to provide Plaintiffs a list of current IPs, and (c) an award of attorney fees.

# II.   BRIEF SUMMARY

This case involves the constitutional rights of the Plaintiffs, who seek to communicate with and advocate for the constitutional rights of hardworking in-home care providers in Washington.  Sections 2(3) and 7-11 of Initiative 1501 ("I-1501") impose an unconstitutional burden on Plaintiffs' Free Speech and Equal Protection rights.

In 2014, the United States Supreme Court held in *Harris v. Quinn*, 134 S. Ct. 2618 (2014) ("*Harris*") that quasi-government employees such as Individual Providers and Childcare Providers (collectively, "IPs") could not be forced to belong to or otherwise financially support a union because it violated their First Amendment rights.  IPs provide in-home care to disabled adults and children who receive government benefits.  Prior to the decision in *Harris*, IPs in Washington were required to belong to or financially support either Service Employees International Union Healthcare 775NW ("SEIU 775") or Service Employees International Union Local 925 ("SEIU 925") (collectively, the "Unions").

Immediately after *Harris* was issued in 2014, the Foundation sought to learn the identities of IPs through public records requests ("PRRs") to Defendants Washington Department of Social and Health Services ("DSHS") and Washington Department of Early Learning ("DEL"), in order to communicate with the IPs about their *Harris* rights.  The Unions

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 1
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    vigorously fought these efforts with successive legal actions.  After years of the Unions' delay

2    tactics, defendants DSHS and DEL produced a list of IPs that was two years old (a list of 2014

3    IPs produced in 2016).  Because of the high annual turnover in IPs, the list was largely outdated.

4           More recently, Plaintiffs Benn and Thurber sought to hold an election to replace

5    SEIU 925 with a different association (which requires signatures from 30% of the IPs), but were

6    effectively precluded from challenging SEIU 925 because the State will not identify the IPs.

7    Without knowing who the "voters" are it is impossible to campaign to them, either to seek an

8    election or to advocate for a different association to replace the existing one.  The real-world

9    result of I-1501 is to guarantee the existing unions will be the IPs' representatives in perpetuity.

10          In addition to court actions, the Unions sought to block *Harris* by crafting,

11   promoting, and funding the campaign for I-1501, which they placed on the ballot in 2016.  I-

12   1501's purported purpose was to combat financial crimes against seniors and vulnerable

13   individuals.  But I-1501 also included provisions amending the Washington Public Records Act,

14   RCW 42.56 et seq. and provisions related agency release of information (RCW 43.17.410)

15   (collectively "PRA") to preclude non-preferred entities (like Plaintiffs) from learning the

16   identities of the IPs.  At the same time, I-1501 carved out an exception for the Unions so that

17   they could continue to obtain the very information denied to Plaintiffs (RCW 42.56.645(d)).

18          As various documents demonstrate, the purpose of the PRA provisions of I-

19   1501was to stop the Foundation from communicating to IPs.  There was and is no evidence of

20   identity theft or financial crimes against anyone related to PRA requests.  Further, in other areas

21   the State provides significantly more detailed personal information of individuals (including

22   seniors) if the requester promises to not illegally use the data, demonstrating that there are

23   reasonable alternatives short of a complete ban to protect personal data.

24          There is no question that the Unions and Plaintiffs disagree as to the benefits or

25   detriments of union membership.  But that is not the issue before this Court.  Rather, the issues

26   here are whether it is unconstitutional for the government to (a) preclude Plaintiffs from

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 2
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1   exercising their free speech and association rights by effectively denying them access to their

2   intended audience, (b) deny IPs the right to decide for themselves if they will hear Plaintiffs'

3   messages, and (c) take sides in a debate by providing the Unions the identity of the IPs, while

4   simultaneously denying that necessary identification information to Plaintiffs.   There is no

5   material issue of fact, and Plaintiffs ask this Court to grant their motion.

6                              **III.   EVIDENCE REPLIED UPON**

7                Plaintiffs rely on the declarations of Maxford Nelsen ("Second Nelsen Decl."),

8   Matt Hayward ("Hayward Decl."), David Bramblett ("Bramblett Decl."), Brian Minnich

9   ("Minnich Decl."), Hannah Sells ("Sells Decl."), and Susan Stahlfeld ("Stahlfeld Decl."); and

10  their attached exhibits, if any; and the pleadings and papers within the Court's file (including

11  declarations previously filed in support of Plaintiffs' Motion for Temporary Restraining Order).

12                            **IV.   FACTUAL BACKGROUND**

13  **A.      IPS, IDENTITY OF PARTIES, AND RELATED ENTITIES**

14          **1.      IPs and Their *Harris* rights**

15              Medicaid recipients may use those benefits to pay for care provided in their

16  homes by IPs.   Prior to 2014, Defendants required IPs to belong to or otherwise financially

17  support one of two unions (SEIU 775 or SEIU 925). There are approximately 46,000 IPs in

18  Washington in any given month, with 40% turnover in any given year in the identities of the IPs.

19  First Nelsen Decl. (Dkt. 6) ¶¶ 23-24; Second Nelsen Decl. ¶ 4.

20              In 2014, the U.S. Supreme Court ruled in *Harris* that forcing IPs to belong to or

21  financially support a union violated their constitutional rights.   Since then, Plaintiffs have

22  endeavored to communicate these rights to IPs.   But because IPs work in individual homes

23  scattered throughout the state, they are nearly impossible to identify.   Despite intensive efforts,

24  Plaintiffs have been unable to identify the vast majority of IPs except through PRRs to

25  Defendants.[1]   First Nelsen Decl. ¶¶ 11-13, 22-24, 30, 40; Hayward Decl. ¶ 17.

26  ─────────────────
[1] If Defendants or the Campaign know of other methods to effectively identify IPs, Plaintiffs invite them to provide

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 3
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1       In 2016, the Unions created and financed I-1501.  Sections 8 and 10 of this

2   initiative changed the PRA and other statutes to make the names and other information of the IPs

3   no longer subject to PRRs, though that information remains available to the Unions.

4       **2.      Plaintiffs**

5       Boardman is an Individual Provider caring for his disabled sister-in-law in their

6   home.  Following *Harris*, he opted out of SEIU 775, and has been trying to communicate with

7   other IPs to inform them of their *Harris* rights.  Boardman Decl. (Dkt. 6) ¶ 4.  In July 2015 and

8   March 2017, he submitted PRRs asking for the names and contact information of IPs who were

9   on DSHS payroll, but DSHS denied the request based on I-1501.  *Id*. ¶¶ 8-10.

10      Thurber and Benn are Childcare Providers living in Spokane who each run a child

11  care facility that receives or has received state subsidies.  Benn Decl. (Dkt. 5) at ¶¶ 2-3; Thurber

12  Decl. (Dkt. 4) ¶¶ 2-3.  Prior to the passage of I-1501, they obtained the names of Childcare

13  Providers and communicated with them about issues relevant to Childcare Providers, though

14  SEIU 925 sued Benn to block her PRR requests.  Benn Decl. ¶¶ 4-9; Thurber Decl. ¶¶ 4-5.  In

15  2017, they sought to advocate for an election to replace SEIU 925 with a different association,

16  but such an election may only be held if 30 percent of the bargaining unit requests it.  Benn Decl.

17  ¶¶ 10-12; Thurber Decl. ¶¶ 7-9; RCW 41.56.070.  Thurber and Benn submitted PRRs asking for

18  the identities of the IPs but the request was denied based on I-1501.  As a result, they could not

19  even <u>identify</u> 30 percent of the current Childcare Providers, so of course could not get signatures

20  from 30 percent of the members. Benn Decl. ¶¶ 13-16; Thurber Decl. ¶¶ 10-14.  Benn and

21  Thurber attempted to use an out-of-date contact list, but received hundreds of letters returned in

22  the mail as undeliverable, and have no way of knowing how many new Childcare Providers were

23  never even on the outdated list.  Benn Decl. ¶¶ 11-12; Thurber Decl. ¶ 11.

24      The Foundation is a nonprofit organization advocating for the civil and

25  _____

26  that information.  It's not as if Plaintiffs enjoy constantly being in court fighting to just be able to find out the
    identities of the individuals whom they wish to inform about their First Amendment rights.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 4
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    constitutional rights of public sector employees and quasi-employees (i.e., the IPs) and for

2    transparency in public sector collective bargaining.   Sells Decl. ¶ 2-3.   Pertinent here, the

3    Foundation works with Boardman, Thurber, Benn, and others to inform IPs of their *Harris*

4    rights.   This includes filing multiple PRRs to identify IPs, which efforts were vigorously fought

5    by the Unions, and stymied by defendants.   *Id.* ¶¶ 3-8.   Although the Foundation was ultimately

6    successful, the Unions delayed the process long enough to make much of the information

7    unusable because of the significant turnover in IPs each year.   First Nelsen Decl. ¶ 19-24.

8         **3.     Defendants**

9              Governor Jay Inslee ("Governor") is the Governor of the State of Washington.

10             Patricia Lashway is the Acting Secretary of DSHS.   Answer ¶ 10.   DSHS is the

11   agency that administers the programs related to the health care IPs.   DSHS has denied Plaintiffs'

12   PRRs since passage of I-1501.   Boardman Decl. ¶ 10.

13             Ross Hunter is the Director of DEL.   Answer ¶ 11.   DEL is the agency that

14   administers the programs related to the Childcare IPs.   DEL has denied Plaintiffs' PRRs since

15   passage of I-1501.   Benn Decl. ¶¶ 13-16; Thurber Decl. ¶¶ 12-13.

16        **4.     Intervenor Campaign**

17             The Campaign to Prevent Fraud and Protect Seniors ("Campaign") was the

18   organization created to advocate for passage of I-1501.   The Campaign Chairman was Adam

19   Glickman.   Glickman Decl. (Dkt. 18).   Mr. Glickman also serves as the Secretary-Treasurer for

20   SEIU 775, and as the Vice Chair of Fuse Washington.   Stahlfeld Decl. ¶ 12.

21             The Campaign's financing was and continues to be overwhelmingly from the

22   Unions.   Through the end of 2017, the Campaign had total contributions of $2,060,939, of which

23   $1,809,526 came from SEIU 775 and $250,000 from SEIU 925 (collectively, 99.9% of the total

24   contributions to the Campaign).   Stahlfeld Decl. ¶13.   The Campaign's intervention in this

25   lawsuit is being financed entirely by SEIU 775.   *Id.*

26

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 5
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

**B.      UNIONS' EARLY EFFORTS TO QUASH PLAINTIFFS' PRA RIGHTS**

On July 2, 2014—two days after the Supreme Court handed down *Harris*—the Foundation submitted a PRA request to DSHS asking for a list of IPs. First Nelsen Decl. ¶ 17. Although DSHS determined the records were disclosable, SEIU 775 sued to prevent DSHS from disclosing them and a Washington Superior Court granted SEIU 775 a TRO preventing disclosure. *Id.* ¶¶ 18-19. Two weeks later, that same court held that the Foundation was entitled to the list but kept the restraining order in place during the appeal. *Id.*  On appeal, SEIU 775 fared no better. *SEIU 775 v. Freedom Found.*, 193 Wn. App. 377 (2016) (holding that the Foundation was entitled to the list).

After the Washington Supreme Court refused to review the Court of Appeals' decision, the list of IPs was finally disclosed to the Foundation on September 28, 2016—819 days after requested. But that list was only current as of July 2, 2014, the date of the Foundation's initial PRR. In a two-year period, turnover for IPs may approach 40%. *See* First Nelsen Decl. ¶ 24.  As a result, the list was very outdated.  The Foundation submitted a new, identical PRA request to DSHS on September 29, 2016.  *Id.* ¶ 20. This request, as well as a 2015 request by Boardman, were followed by more lawsuits by the Unions.  These new lawsuits delayed the release of the information until after passage of I-1501, and ultimately Plaintiffs never obtained a list of current IPs for their outreach efforts.  Sells Decl. ¶¶ 7-8.

**C.      CREATION AND IMPACT OF I-1501**

I-1501 – the brainchild of SEIU 775's Secretary-Treasurer, Adam Glickman – ensures that preferred speakers (e.g., the Unions) are able to contact IPs and communicate with them regarding union issues, and prevents disfavored speakers (the Foundation and apparently the IPs themselves-Boardman, Benn, and Thurber) the ability to do exactly the same thing.

**1.      Only effective change was to keep non-preferred entities and individuals such as Plaintiffs from learning the names of the IPs.**

I-1501 amended the PRA to preclude the government from providing the

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1    identities of benefit recipients or their in-home caregivers (IPs) from being disclosed in response

2    to PRRs.  But these provisions were meaningless as to the benefit recipients because their

3    identity was <u>already</u> protected from disclosures.  *See* RCW 42.56.230(1) - (2).  Likewise, as to

4    the IPs, their private contact information was already exempted from disclosure.  *See*

5    RCW 42.56.230(3), .250(4).  The only true effect of I-1501's PRA provisions was to preclude

6    anyone other than approved groups from being able to learn the identity of IPs.

7           **2.**    <u>Carve-outs from prohibitions for disclosures:  yes for the Unions, no for Plaintiffs.</u>

8                  Section 11 of I-1501 created carve-outs for specific entities from the PRA

9    prohibitions in §8 of I-1501.  One carve-out is for the Unions.  RCW 42.56.645(1)(d).  Another

10   is for persons and entities that contract with the state to provide services to vulnerable

11   individuals.  RCW 42.56.645(1)(g).

12                 This Court inquired at the hearing on Plaintiffs' motion for temporary restraining

13   order whether the contract carve-out (§11(g)) applied to the individual Plaintiffs because they

14   had contracts with the state to perform services for vulnerable individuals as IPs.  TRO

15   Transcript, (Dkt. 24) at 22:17-23:1.  Subsequently, Plaintiff Boardman filed a motion to show

16   cause why he was not able to obtain IP contact information under this exception since he had a

17   contract with the state to provide services for his sister-in-law.  His motion was opposed by both

18   DSHS and the Campaign.  The court agreed with DSHS and the Campaign, and ruled that the

19   exception did <u>not</u> apply to Boardman's public records request for a list of IPs.  Sells Decl. ¶¶ 11-

20   12, Exhibits I-M.  As a result, none of the carve-outs apply to Plaintiffs.

21          **3.**    <u>No evidence of any identity theft related to PRRs</u>

22                 Even now there is no evidence there has ever been any identity theft or fraud (the

23   prevention which being the purported purpose of I-1501), related to PRRs, much less requests for

24   IP identities leading to fraud of other people, including no evidence known to the Campaign or

25   the Unions who crafted and funded I-1501.  Stahlfeld Decl.(¶¶ 2-3, Exs. A-C.  Indeed, AARP

26   Washington (long an advocate of policies to prevent identity theft of seniors and vulnerable

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 7
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    adults) declined to endorse I-1501, noting that identity thieves "do not fill out PRRs to get their

2    victims.  That's not how it works."  *Id.* Ex. D (article quoting Doug Shadel, State Director of

3    AARP Washington).

4         **4.**    Plaintiffs' efforts after passage of I-1501.

5              The 46,000 Washington IPs, scattered throughout the state, represent less than one

6    percent (<1%) of Washington's 7.4 million population.  The Foundation has attempted to

7    communicate with the IPs through web-based advertising and publicity, but that is like trying to

8    find a needle in a haystack.  Social media advertising is no different than television advertising–

9    many people may see the messages, but there is no way of knowing if the handful of

10   Washington's population who are IPs are exposed to such broadcast messages, and it's

11   prohibitively expensive.  Bramblett Decl. ¶¶ 4-16; Minnich Decl. ¶¶ 4-10; Hayward Decl. ¶ 6.  It

12   was also impossible for Plaintiffs Benn and Thurber to identify the IPs for purposes of

13   communicating with them about an election or replacement union.  Benn Decl. ¶¶ 12, 15-16;

14   Thurber Decl. ¶¶ 11, 14.

15             The Foundation also unsuccessfully pursued other avenues of communication

16   with the IPs.  For example, the Foundation requested public records showing the time, date, and

17   location of contracting appointments between the state and potential new IPs, at which the state

18   facilitates the Unions' ability to speak to the new IPs by scheduling meetings for the Unions with

19   the IPs,[2] but prohibits the Foundation from speaking.  The few contacts the Foundation  was able

20   to make this way were limited and very expensive.  Hayward Decl. ¶¶ 10-15.  However, this

21   request too was met with litigation by the Unions.  *Id.*, ¶ 12.

22             As a practical matter, the only modes of communication which are effective in

23   reaching the IPs without wasting substantial time and sums are individual mailing and door-to-

24   door canvassing.  And that can only be done if Plaintiffs can obtain the names of the IPs through

---

25
26   [2]  Sells Decl. ¶ 13, Ex. N.  While Plaintiffs are not herein challenging Defendants' facilitation of the Unions' speech
     at these new-IP meetings, it is further evidence of the State taking sides in a debate in which it should be neutral.

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 8
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    PRRs.  Hayward Decl. ¶¶ 14-18; Minnich ¶10.

2    **D.      CAMPAIGN AND UNIONS: "VOTE FOR I-1501 TO STOP THE FOUNDATION."**

3        **1.      Campaign communications**

4            In campaign literature, the Campaign explicitly represented that a main purpose of

5    I-1501 was to prevent Plaintiffs from being able to identify IPs and contact them:

6        **Groups like the Freedom Foundation are threatening unions**. … Initiative
7        1501 will keep groups like the Freedom Foundation from getting our personal
         information.  Vote yes on I-1501 to keep our unions strong and protect what
8        we've fought for.

9    Stahlfeld Decl. Ex. G [Nos., 26, 29] (emphasis in original) and

10       **Groups like the Freedom Foundation are threatening our union** … I-1501
11       will keep the Freedom Foundation and others from getting our personal
         information.

12   *Id.*, [Nos. 25, 28] (emphasis in original).  Likewise, in an email exchange with the editorial board

13   of The Stranger in October 2016, Glickman argued in favor of I-1501 because the contact

14   information of IPs should not be "made available to the Freedom Foundation or any other

15   advocacy/political/religious group with an agenda."  *Id.* [Nos. 146-47].

16       **2.      Union communications**

17           SEIU 775 also directly urged people to vote for I-1501 as a way of stopping the

18   Foundation.  *See, e.g.*, emails to various legislative district voters which contained the following:

19       I-1501 will prevent all public disclosure of information of vulnerable individuals
         and in-home caregivers, including blocking any pending disclosure requests.  By
20       voting Yes we protect caregivers in our union from anti-union bullying[3] of the
         Freedom Foundation.
21

22   Stahlfeld Decl. Ex. H [No.1605] (emphasis added). And another email:

23       There's one more way you can fight to stop the Freedom Foundation.  When you
         get your ballot in the mail, vote YES on I-1501, which protects the private
24       information of caregivers and our state's most vulnerable.

25   _____

26   [3] The Foundation disputes that it has ever engaged in "bullying," but the use of that term in this communication
     further demonstrates the anti-Foundation animus of these integrated organizations.

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    *Id.* [Nos. 1578-79] (emphasis added).  A week before the election, SEIU 775 sent this message:

2         Yes! On 1501.  I-1501 will prevent all public disclosure of information of in-
          home caregivers and vulnerable individuals, including blocking any pending
3         disclosure requests.  <u>By voting Yes we protect caregivers in our union from anti-
          union bullying from the Freedom Foundation</u>.
4
5    *Id.* [Nos. 1650-01] (emphasis added).

6         The day after the 2016 election, SEIU 775 President David Rolf sent an email

7    celebrating the passage of I-1501 as "<u>protecting caregivers from the Freedom Foundation</u> or

8    other groups getting access to their personal information," with no mention of anything related to

9    identity theft of vulnerable individuals.  Sells Decl. Ex. H.

10        Internal Union communications are also revealing.  For example, the Legislative

11   and Policy Director for SEIU 775 created talking points that included the statement that I-1501

12   "began as legislation to look into how outside groups were using/abusing the Public Records Act

13   to get private information of long term care workers…" Stahlfeld Decl., Ex. H [Nos. 2142-45].

14   That is, the initial purpose of I-1501 was to stop the Foundation from obtaining a list of IPs

15   through PRRs, not to fight financial crimes against seniors, a justification added only later on.

16        Though less prolific than SEIU 775, SEIU 925 also sent messages urging passage

17   of I-1501 because it "protects worker privacy" – and no mention of any other purpose, including

18   no mention of stopping identity theft of vulnerable individuals.  *Id.* Ex. I [Nos. 1, 4].

19        Union allies also pushed the Unions' "vote for I-1501 to stop the Foundation"

20   message.  In the 2016 election, Fuse Vote (who received donations from the Unions) used

21   government email to distribute a 2016 Voters' Guide urging passage of I-1501 by stating in part:

22        The right-wing <u>Freedom Foundation is strongly opposed to this initiative.  They
          have been working to acquire the names and contact information of home health
23        care workers and child care providers</u> as part of a deceptive campaign to destroy
          the unions, <u>and this initiative would prevent them from acquiring that private
24        personal data from the state</u>.

25   Stahlfeld Decl. ¶¶ 6, 13, 15, Ex. F (emphasis added).

26

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

**E.     GOVERNOR KNOWS REAL INTENT OF I-1501 TO STOP THE FOUNDATION.**

In June 2016, General Counsel to Governor Inslee, Nicholas Brown, asked for "a summary of initiative I-1501.  It ostensibly deals with ID theft, but is aimed at preventing the state from releasing public records."  Stahlfeld Decl., Ex. E [No. 08] (emphasis added).

In September 2016, Paulette Avalos, Senior Policy Advisor to Governor Inslee, was provided draft remarks that SEIU 775 was asking Governor Inslee to deliver to its members on I-1501 (which Ms. Avalos called the "privacy initiative"), including the following:

> ADAM [GLICKMAN]:  Because privacy has been such a major issue over the past several months – the Freedom Foundation has been aggressively contacting our members, trying to convince them to give up their union rights.  So privacy is a major priority moving forward.  We're fighting to protect caregiver privacy both in contract negotiations [with the State] and by supporting Initiative 1501.
>
> ***
>
> STERLING:  Governor Inslee, you may have heard about this group called the Freedom Foundation that is contacting home care workers at our homes and flooding our mailboxes.  How can you help protect our privacy?
>
> GOVERNOR:  What the Freedom Foundation is doing is wrong.  … I will work to make sure that groups like the Freedom Foundation do not get access to lists that they are not entitled to …

*Id.*, Ex. E [Nos. 13, 22] (emphasis added).

**F.     OPEN AVAILABILITY OF DETAILED VOTER REGISTRATION LISTS DEMONSTRATES THAT ADEQUATE STEPS SHORT OF TOTAL BAR EXIST.**

To meet its purported goal of preventing fraud, I-1501 completely bars release of IP information to Plaintiffs and other parties not preapproved by the Union-crafted initiative.  I-1501 ignores numerous possible methods short of a complete bar to meet the purported goal.

The State itself demonstrates that adequate steps short of a complete bar exist to prevent misuse of personally identifying information.  For example, since at least March 2012, anyone who submits an online request to the Washington Secretary of State will be provided detailed personal information about registered voters as long as the requester affirms online that they will abide by the laws on use of the data, including "taking reasonable precautions."  If the

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1   requester agrees, they will be provided up to 36 different pieces of information including that

2   voter's name, address, gender, and date of birth.  Stahlfeld Decl. Ex. J.

3          Likewise, I-1501 allows the State discloses IP information to approved third-

4   parties (like the Unions) who agree to take steps to protect the confidentiality of the data, but

5   does not allow disclosure of IP information to Plaintiffs under the same conditions.  I-1501 § 11.

6   Other than the distinction imposed by the Unions when they crafted I-1501, there is no reason

7   why IP information cannot be provided to Plaintiffs under the same conditions applicable to the

8   Unions, or as the State finds fully adequate for the protection of registered voter data.

9                              **V.  ISSUES PRESENTED**

10         1.     Whether §§ 2(3), 7-11 of I-1501 violate the First Amendment by

11  precluding Plaintiffs from learning the identity of IPs, effectively barring access to their intended

12  audience (IPs)?

13         2.     Whether §§ 2(3), 7-11 of I-1501 violate the IPs' First Amendment rights to

14  receive speech by precluding third parties like Plaintiffs from learning their identities for speech

15  purposes, thus declining IPs the right to decide for themselves whether to hear Plaintiffs' speech?

16         3.     Whether §§ 2(3), 7-11 of I-1501 violate the Plaintiffs' and IPs' freedom of

17  association rights by effectively preventing them from challenging the Unions?

18         4.     Whether §§ 2(3), 7-11 of I-1501 violate the Equal Protection clause by

19  treating similarly situated groups differently or in the alternative, whether it was motivated by

20  animus against Plaintiffs' message and favors the Unions' speech?

21         5.     Whether §§ 2(3), 7-11 of I-1501 are facially overbroad or overbroad as

22  applied to Plaintiffs?

23         6.     Whether Plaintiffs are entitled to attorney fees?

24

25

26

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 12
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1

## VI.  **ARGUMENT**

2

**A.     DEFENDANTS ARE INTERFERING WITH PLAINTIFFS' FUNDAMENTAL RIGHTS AND I-1501 DOES NOT PASS STRICT SCRUTINY.**

3

4              Laws that suppress public issues speech are presumptively unconstitutional. *See*

5   *Carey v. Brown*, 447 U.S. 455, 461-62 (1980); *Police Dept. of City of Chicago v. Mosley*, 408

6   U.S. 92, 94-95 (1972). When evaluating First Amendment and Equal Protection claims, courts

7   look to the "real and appreciable impact" on the exercise of fundamental rights; they do not

8   "ignore reality." *Bullock v. Carter*, 405 U.S. 134, 144 (1972).   This "impact" analysis is

9   especially important when applied to core public issues speech, which is entitled to the greatest

10  constitutional protection.  *Meyer v. Grant*, 486 U.S. 414, 420, 425 (1988) (calling public issues

11  speech "an area in which the importance of First Amendment Protections is at its zenith").

12              The First Amendment broadly protects not only the expression of speech but also

13  the methods used to facilitate speech.[4]   *Meyer*, 486 U.S. at 421-22.   In *Meyer,* the Court

14  invalidated a Colorado statute which made it a felony to pay petition circulators. *Id.* at 415-16.

15  Though the statute did not facially regulate speech, the Court reasoned that it restricted protected

16  speech by 1) limiting the number of voices who conveyed the petition circulators' message, and

17  2) reducing the petition circulators' ability to make the issue a statewide discussion. *Id.* at 422-

18  23.  Similarly, the Court has invalidated a state statute that forced candidates to pay a hefty filing

19  fee to place their name on primary ballots and applied "rigorous" or "stringent" scrutiny because

20  the law "creates barriers to candidate access to the primary ballot" and imposes "a real and

21  appreciable impact on the exercise of the franchise."  *Bullock*, 405 U.S. at 143-44; *see also*

22  *Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 589 (*the right of access "[a]nalysis is not

23  _____

24  [4] The general rule that there is no "First Amendment guarantee of a right of access to all sources of information within government control" is not applicable in this case.  *Houchins v. KQED, Inc.*, 438 U.S. 1, 9 (1978). Unlike in

25  *Houchins*, Plaintiffs do not "argue for an implied special right of access to government-controlled sources of information" *Id.* Rather, I-1501 is not facially neutral and has the effect of chilling Plaintiffs' speech and association rights.  *See Meyer*, 486 U.S. at 424-25 9"[P]rohibition of paid petition circulators restricted access to the most

26  effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication.").

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

1  advanced by rhetorical statements that all information bears upon public issues; what is crucial in

2  individual cases is whether access to a particular government process is important in terms of

3  that very process.") (Brennan, J. concurring with the plurality).

4  It is undisputed that Plaintiffs' speech is about public issues and constitutional

5  rights.   Accordingly, Defendants' infringement on Plaintiffs' speech is subject to exacting

6  scrutiny.  *Meyer*, 486 U.S. at 420.  "Legislative restrictions on…the discussion of political policy

7  generally" is "wholly at odds with the guarantees of the First Amendment." *Id.* at 428 (citing

8  *Buckley v. Valeo*, 424 U.S. 1, 50 (1976)).

9  Because I-1501 is subject to strict scrutiny, it must be narrowly tailored to serve a

10  compelling state interest.  *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2231 (2015).  Sections 2(3)

11  and 7-11 of I-1501 are not narrowly tailored because prior PRA protections already protected the

12  beneficiaries and most IP information.   Likewise, I-1501 ignores more limited means of

13  protecting against identity theft and fraud, such as the confidentiality requirements under which

14  the Unions are allowed access to the data under I-1501, or the confirmation of legal compliance

15  required to obtain personally identifying information from the voter registration lists.

16  **B.**     **REFUSING TO PROVIDE IDENTITY OF THE IPS EFFECTIVELY**
           **PRECLUDES PLAINTIFFS' ACCESS TO THE IPS.**
17

18        **1.**     **Plaintiffs Seek to Utilize Modes of Communication, Long Recognized as**
                 **Venerable by the Supreme Court.**

19  Plaintiffs seek to communicate with a small number of people -- the only people

20  who could exercise *Harris* rights or engage in voting about union representation of the IPs.

21  The modes of communications that Plaintiffs utilized before I-1501 and which are

22  the only effective modes—mailing and personal conversation through door canvassing—have

23  long been recognized by the U.S. Supreme Court as venerable modes of communications,

24  particularly for individuals of modest means and their support groups.  *See, e.g.*, *Schneider v.*

25  *State of New Jersey, Town of Irvington*, 308 U.S. 147, 164 (1939) ("Pamphlets have proved most

26  effective instruments in the dissemination of opinion.  And perhaps the most effective way of

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 14
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    bringing them to the notice of individuals is their distribution at the homes of the people.");

2    *Martin v. City of Struthers, OH*, 319 U.S. 141, 141, 145 (1943) ("For centuries it has been a

3    common practice in this and other countries of persons not specifically invited to go from home

4    to home and knock on doors or ring doorbells to communicate ideas to the occupants. … Door to

5    door distribution of circulars is essential to the poorly financed causes of little people.").

6           In *Schneider* and *Martin*, the communities that were the intended audience could

7    be ascertained geographically, and the government actions found to violate the First Amendment

8    barred access to the audience based on geographical basis:  no going door-to-door in *this*

9    neighborhood, no handing out literature on *that* street.  Here, the community of IPs cannot be

10   ascertained geographically, but only through identification of individuals who are IPs—

11   information uniquely in the hands of the government.  And while I-1501 carves out an exception

12   for the Unions to be informed of which individuals are in the community of IPs, I-1501 bars third

13   parties like Plaintiffs from getting that information for any purpose.

14          **2.      Barring Access to an Audience is Unconstitutional, Even if Content Neutral
                      and Enacted for Legitimate Reasons.**

15

16          It has long been the law that governments cannot ban access to an audience, even

17   if the ban is content neutral and enacted for legitimate reasons.

18          For example, in *Schneider*, the Court found various city ordinances that

19   prohibited passing out literature on city streets or in residential neighborhoods to violate the First

20   Amendment even though the city offered legitimate content neutral reasons for the prohibitions.

21   As to prohibitions to leafletting on city streets, the justification offered was to prevent littering.

22   In one instance, a union organizer was picketing in front of a meat market and handing out

23   literature asking people to not patronize the market.  He was arrested for violation of the

24   Milwaukee ordinance prohibiting leafletting.  The Court acknowledged that there was nothing

25   wrong with Milwaukee wanting to control littering, but found that reason to be insufficient to

26   justify a ban on leafletting on city streets, which is where the speaker's audience was located.

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    The Court noted that there were alternative methods of meeting the anti-littering goal other than

2    a blanket prohibition, including punishing those who actually threw the paper on the streets.  308

3    U.S. at 162.  The Court held the prohibition violated the First Amendment.

4            Also in *Schneider*, the Court found that a prohibition on going door-to-door in a

5    residential neighborhood without pre-approval of the police that the person was "of good

6    character" violated the First Amendment, notwithstanding the city's asserted legitimate motive of

7    protecting its residents from disturbance and annoyance, fraudulent solicitations, and unknown

8    strangers from visiting houses.  *Id.*, at 164 ("Frauds may be denounced as offenses and punished

9    by law…. [even if] these means are less efficient and convenient than … [empowering] police

10   authorities to decide what information may be disseminated from house to house, and who may

11   impart the information, the answer is that considerations of this sort do not empower a

12   municipality to abridge freedom of speech.").  *Id.  See also*, *Martin*, 319 U.S. at 146-49 (content

13   neutral ban on distributing literature door-to-door was nonetheless unconstitutional under First

14   Amendment even though justified in part by legitimate concern that burglars might pose as

15   canvassers as a pretense to discover whether a home was empty and ripe for burglary).  Even

16   bans that provide limited exceptions for certain favored entities or messages can be

17   unconstitutional.  *City of Ladue v. Gilleo*, 512 U.S. 43 (1994) (ordinance prohibiting residential

18   signs other than "for sale or lease" signs and allowing commercial, church and school signs

19   violated First Amendment, even given legitimate desire to avoid hazards created by signs).

20           In particular, the justifications for the last ordinance discussed in *Schneider* and

21   the ordinance in *Martin* mirror the justification offered for the PRA provisions of I-1501:   to

22   prevent some hypothetical person from committing identity theft of a vulnerable individual by

23   obtaining information about an IP through a PRR.  While preventing fraud and identity theft are

24   laudable goals, they "may be denounced as offenses and punished by law" (which they are), and

25   while punishing actual criminals who misuse the information may be "less efficient and

26   convenient" than precluding everyone from access to the intended audience, neither of those

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 16
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1  justifications constitutionally empower the state to abridge the freedom of speech.

2        It is also not enough to say that the speaker could find some other way to

3  communicate with his or her intended audience as an alternative to the banned mode, such as

4  bumper stickers or newspaper ads.  *See, e.g.*, *Ladue*, 512 U.S. at 56 (bumper stickers, newspaper

5  ads, and other modes of communication were not adequate substitutes for the important medium

6  of speech plaintiff sought to use, residential sign).  As the Court noted, more expensive and time-

7  consuming modes of communication are not adequate alternatives because they "may make the

8  difference between participating and not participating in some public debate."  *Id.* at 57.  In the

9  case of yard signs, the court noted the importance of that mode of communication was not only

10  because it could be afforded by a person of modest means, but because it is a way to reach an

11  audience (the plaintiff's neighbors) that could not be reached nearly as well by other means.  *Id.*

12  "[R]egulation of a medium inevitably affects communication itself."  *Id.* at 48.

13       **3.**     **Refusing to Provide the Names of the IPs is the Constitutional Equivalent of**
14             **Barring Access to a Neighborhood or Knowledge of Who Were Voters.**

15        Plaintiffs sought to learn the identity of the IPs for two primary reasons:  to speak

16  to them about their *Harris* rights, and to advocate for an election to replace one union for

17  another.  The government's refusal to inform Plaintiffs of the identity of their audience—

18  information not available to Plaintiffs from any other source—is the equivalent of the

19  government refusing to allow access to a neighborhood or street, or refusing to tell a challenger

20  candidate who the voters are that need to be persuaded in an election.

21        The reason speaking on a street or going door-to-door is protected by the First

22  Amendment is because that is how speakers reach their intended audience.  There is nothing of

23  intrinsic value in standing on a street speaking or knocking on doors.  The value is in reaching an

24  intended audience, which in many (if not most) cases can be identified geographically.  The

25  union activist opposing a union-free meat market wants to reach the customers of that meat

26  market, and that can be done by speaking on the street in front of the meat market – it could not

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 17
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    be done by going to some government-approved park 10 miles away, or buying ads in a city-

2    wide newspaper.  The value of speaking on <u>that</u> street is because that is where the intended

3    audience is, and that is why a government prohibition for speaking on <u>that</u> street is

4    unconstitutional, because it effectively denies the speaker access to his audience.  Likewise, a

5    government could not constitutionally refuse to tell a legislative district challenger which voters

6    are in the challenger's district (while at the same time providing the identity of the voters to the

7    incumbent) just because the challenger candidate could buy Facebooks ads that reach millions of

8    people, a handful of whom <u>might</u> be voters in the district.

9           Here, it is undisputed that the Plaintiffs' intended audience cannot be determined

10    or delineated by geographical means.  None of the Plaintiffs can look around and locate their

11    intended audience, or otherwise identify the individuals belonging to their intended audience.

12    The only source of that information is the government.  And just like the government could not

13    refuse to provide a challenger information as to the identity of the voters in a district, the

14    government cannot here impose a complete bar on providing to Plaintiffs the identity of the IPs

15    who vote on union representation.

16           It is no answer to say that Plaintiffs could broadcast their messages to the entire

17    7.4 million people who live in Washington and by that means maybe reach the IPs.  Likewise,

18    even though the Foundation has attempted to reach new IPs by hanging around where mandatory

19    contracting meetings occur, that only allows access to a handful of the IPs (and only new ones)

20    and is an expensive and less effective means of communication than that sought by Plaintiffs:  to

21    be able to access the individual IPs through mail directed to them and door-to-door canvassing.

22    As the Supreme Court precedent makes clear, the alternatives left to Plaintiffs now that they have

23    been effectively banned from accessing the community of IPs are not adequate alternatives.  I-

24    1501 is an unconstitutional burden on Plaintiffs' freedom of speech rights.

25    **C.**    **IPS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION.**

26           "It is the purpose of the First Amendment to preserve an uninhibited marketplace

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 18
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1   of ideas in which truth will ultimately prevail . . . <u>It is the right of the public to receive suitable</u>

2   <u>access to social, political, esthetic, moral, and other ideas</u> and experiences which is crucial here.

3   <u>That right may not constitutionally be abridged</u> . . ." *Red Lion Broadcasting Co. v. FCC*, 395

4   U.S. 367, 390 (1969) (emphasis added); s*ee also*, *Thomas v. Collins*, 323 U.S. 516, 534 (1945)

5   (labor organizer's right to speak and the rights of workers "to hear what he had to say," were both

6   abridged by a state law requiring organizers to register before soliciting union membership);

7   *Stanley v. Georgia*, 394 U.S. 557, 564 (1969) ("the right to receive information and ideas,

8   regardless of their social worth, [citation omitted] is fundamental to our free society.").

9      The First Amendment "right to receive" includes the right to determine for oneself

10   whether to receive information and ideas, as opposed to the government deciding whether

11   individuals should be able to receive information and ideas:

12     We are faced in the instant case with the necessity of weighing the conflicting
interests of the appellant in the civil rights she claims, <u>as well as the right of the</u>

13   <u>individual householder to determine whether he is willing to receive her message,</u>
against the interest of the community which, by this ordinance, offers to protect

14   the interests of all of its citizens, whether particular citizens want that protection
or not. <u>The ordinance</u> does not control anything but the distribution of literature,

15   and, in that respect, it <u>substitutes the judgment of the community for the judgment</u>
<u>of the individual householder.</u>

16   

17   *Martin*, 319 U.S. at 143-44 (ordinance barring the distribution of literature door-to-door violated

18   the First Amendment rights of both the speaker and the residents, and was unconstitutional)

19   (emphasis added).  Like the community did in *Martin*, pursuant to I-1501 the community here

20   (the voters, unions, and the state) has substituted its judgment for that of the individuals (the IPs).

21   as to whom they can hear from.  Here, as in *Martin*, the individuals do not even know someone

22   wants to hand them literature or discuss issues with them because the government has decided to

23   deny Plaintiffs access to the IPs.  As a result, like the ordinance in *Martin*, I-1501 denies the IPs

24   the right to determine for themselves if they want to hear Plaintiffs' messages, and instead limits

25   and controls what the IPs can hear to only the Unions' message.

26      By effectively denying access to the IPs, I-1501 denies them the right to

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 19
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1  determine for themselves whether to receive Plaintiffs' messages.  It contravenes "the purpose of

2  the First Amendment to preserve an uninhibited marketplace of ideas" (*Red Lion*, supra) and

3  violates the IPs is First Amendment right to determine for themselves if they want to receive

4  information.  It is therefore unconstitutional for this reason, as well.

5  **D.      THE PRA PROVISIONS OF I-1501 ARE FACIALLY OVERBROAD.**

6          I-1501 is impermissibly overbroad, because "a substantial number of its

7  applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."

8  *U.S. v. Stevens*, 559 U.S. 460, 473 (2010).  A facial overbreadth challenge is appropriate when a

9  law discriminates "based on the content or viewpoint of speech by suppressing disfavored speech

10  or disliked speakers." *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 759-60 (1988)

11  (facially invalidating a statute which did not explicitly regulate speech because it burdened a

12  method of dissemination essential to delivering speech).  Laws subject to a facial challenge must

13  bear "a close enough nexus to expression, or to conduct commonly associated with expression, to

14  pose a real and substantial threat of the identified censorship risks." *Id.* Indeed, "where a statute

15  based on a nonexpressive activity has the inevitable effect of singling out those engaged in

16  expressive activity," courts should evaluate it under "'least restrictive means' scrutiny,'" (strict

17  scrutiny).  *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986).  In *Lakewood*, a city

18  ordinance created highly burdensome licensing requirements newspapers had to navigate in

19  order to use news racks on public property. 486 U.S. at 754.  While the Lakewood ordinance did

20  not explicitly regulate speech, "it [was] directed narrowly and specifically at expression or

21  conduct commonly associated with expression: the circulation of newspapers." *Id.* at 760; *see*

22  *also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585

23  (1983) (striking down a tax imposed on newsprint and ink because it singled out newspapers,

24  exercising their constitutionally protected expressive activity, to shoulder its burden.).

25          As in *Lakewood* and *Minneapolis Star*, I-1501 is substantially overbroad because

26  it eliminates Plaintiffs' abilities to engage in constitutionally protected expressive activities,

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 20
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    despite having a "plainly legitimate sweep" of protecting seniors and vulnerable individuals.

2    **E.      I-1501 VIOLATES THE IPS' FREEDOM OF ASSOCIATION RIGHTS.**

3              The First and Fourteenth Amendments prohibit states from abridging freedom of

4    association. *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *Eu v. San Francisco Cnty. Democratic*

5    *Cent. Comm.*, 489 U.S. 214, 225 (1989) (infringement on freedom of association must survive

6    strict scrutiny).  I-1501 eliminates the IPs' (including Plaintiffs') ability to freely associate (or

7    not) in unions. *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2d Cir. 2013)

8    (freedom of association includes the right to associate in unions); *Thomas v. Collins*, 323 U.S.

9    516, 534 (1945) (striking down a Texas labor organizing regulation and affirming that "the right

10   thus to discuss, and inform people concerning, the advantages and disadvantages of unions and

11   joining them is protected not only as part of free speech, but as part of free assembly.").

12             By refusing to tell the Plaintiffs (or any other IP) the identity of the IPs as a result

13   of I-1501, the government is taking away from the Plaintiffs and all the IPs the right and ability

14   to effectively associate with each other, to determine whether they would prefer a different union

15   represent them, to discuss union or other pertinent issues amongst themselves (free of control of

16   the Unions), etc.  This is especially true for Plaintiffs Benn and Thurber, who have sought and

17   continue to seek to contact IPs for the purpose of voting on an alternative union.  (*See* discussion

18   above re hundreds of mailers returned to Plaintiffs as "undeliverable").

19   **F.      I-1501 VIOLATES THE EQUAL PROTECTION CLAUSE.**

20             Laws imposing unequal burdens on speech about public issues are presumptively

21   unconstitutional, without any evidence that animus motivated the unequal burdens.  *Carey*, 447

22   U.S. at 461-62; *Mosley*, 408 U.S. at 94-95.

23             In *Mosley*, the Court invalidated a Chicago ordinance that banned picketing

24   within 150 feet of a school except for labor dispute picketing.  408 U.S. at 93, 101-02.  The

25   Court noted that the central problem with Chicago's ordinance was that it treated union and non-

26   union speech differently. *Id.* at 95-96 ("[G]overnment may not grant the use of a forum to people

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 21
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    whose views it finds acceptable, but deny use to those wishing to express less favored or more

2    controversial views").    Because "Chicago's ordinance imposes a selective restriction on

3    expressive conduct far greater than is essential to the furtherance of a substantial government

4    interest," the ordinance violated the Equal Protection Clause. *Id.* at 102.

5            Like *Mosley*, the Court in *Carey* invalidated an Illinois statute that distinguished

6    between union-related picketing and picketing on other issues. 447 U.S. at 461. The Court

7    explicitly rejected the argument that pro-union speech "is more deserving of First Amendment

8    protection" than is speech "over other issues." *Id.* at 466.  The *Carey* Court ultimately invalidated

9    the statute "because [it] discriminate[d] among pickets based on the subject matter of their

10   expression." *Id.* at 471. Here, just as in *Mosely* and *Carey*, I-1501 allows the Unions to continue

11   obtaining updated IP lists which directly facilitate their speech to IPs, but explicitly denies that

12   right to other speakers—including Plaintiffs. I-1501 violates the Equal Protection Clause,

13   regardless of whether the distinction was motivated by animus.

14   **G.        I-1501 WAS MOTIVATED BY ANIMUS.**

15           Even if I-1501 did not draw distinctions between parties that implicated First

16   Amendment rights, it violates the Equal Protection Clause because it was motivated by animus.

17   When laws treat similarly-situated parties differently, it must do so in a way rationally related to

18   a legitimate government interest. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40

19   (1985).  Laws born out of animosity or a bare desire to harm an unpopular group cannot serve as

20   a legitimate interest and will not survive even rational basis scrutiny. *See Romer v. Evans*, 517

21   U.S. 620, 634 (1996). For example, a minimum-wage statute which drew classifications solely

22   designed to disadvantage specific companies and, correspondingly, benefit unions could not pass

23   rational basis review. *Fowler Packing, Inc. v. Lanier*, 844 F.3d 809, 815 (9th Cir. 2016); *see also*

24   *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973).

25           Regarding voter initiatives, animus may be ascertained from the face of the ballot

26   measure alone (*see, e.g.*, *Romer*) but the motivations of the ballot measure sponsors are also

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 22
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1   relevant.   "[S]tatements made by decision makers or referendum sponsors during deliberation

2   over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an

3   ultimately enacted initiative...."); *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 471

4   (1982) (considering statements of initiative sponsors in subjecting enacted referendum to equal

5   protection scrutiny); *Arlington Heights v. Metropolitan Housing Development Corp*., 429 U.S.,

6   at 268; *Washington v. Davis*, 426 U.S. 229 (1976) (disparate impact may be evidence of

7   discriminatory purpose.).   Washington State's Attorney General concurred when he recently

8   argued that "[i]t is well established that evidence of purpose beyond the face of the challenged

9   law may be considered in evaluating [] Equal Protection Clause claims.  *Washington v. Trump*,

10   847 F.3d 1151, 1167 (9th Cir. 2017) (per curiam).

11          I-1501 was initially conceived to prohibit information about IPs from being

12   available to Plaintiffs under PRRs, with the trappings of protecting seniors and vulnerable

13   individuals from fraud added later in the process. *See* Section D above.  The asserted justification

14   is based on nothing more than speculation that some person might file a PRR and (now on record

15   for requesting the information) commit identity theft or fraud.  Not only is there no evidence that

16   any such crime has ever been related to a PRR, the State itself demonstrates confidence in lesser

17   means than a total ban, such as for example the availability of detailed personally identifying

18   information from the voter registration rolls if the requester affirms compliance with the law.

19          I-1501 lacks any reasonably conceivable justification for its classification

20   distinguishing between non-Union and Union speakers, and it was motivated by animus against

21   Plaintiffs and their message.  I-1501 violates the Equal Protection Clause.

22   **H.      PLAINTIFFS ARE ENTITLED TO THEIR ATTORNEY FEES**

23          Under 42 U.S.C. § 1988(b), this Court, may award attorney fees to Plaintiffs as

24   the prevailing party because Defendants are liable under 42 U.S.C. § 1983.

25                            **VII.  CONCLUSION**

26          For the foregoing reasons, Plaintiffs' motion should be granted, the Court should

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 23
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1    invalidate and enjoin enforcement of §§ 2(3), 7-11 of I-1501 and the Court should require

2    Defendants to produce a current (as of the date of the Court's order) list of IP names to Plaintiffs.

3    Plaintiffs request attorney fees.  A proposed form of order is attached to this motion.

4               DATED this 18th day of July, 2018.

5

6
                               */s/ Susan K. Stahlfeld*
                               */s/ Tara M. O'Hanlon*

7
                               Susan K. Stahlfeld, WSB No. 22003
                               Tara M. O'Hanlon, WSB No. 45517

8
                               Miller Nash Graham & Dunn LLP
                               Pier 70, 2801 Alaskan Way, Suite 300

9
                               Seattle, Washington  98121
                               Telephone:  (206) 624-8300

10
                               Fax:  (206) 340-9599
                               Email:  susan.stahlfeld@millernash.com

11
                               tara.ohanlon@millernash.com

12
                               */s/ Hannah Sells*
                               Hannah Sells, WSB No. 52692

13
                               c/o Freedom Foundation
                               P.O. Box 552

14
                               Olympia, Washington  98507
                               Telephone:  (360) 956-3482

15
                               Email:  HSells@freedomfoundation.com

16
                               Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT - 24
(Case No. 3:17-cv-05255-BHS)

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4

1

<u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that on July 18, 2018, I electronically filed the foregoing with the

3

Clerk of the Court using the CM/ECF system which will send notification of such filing to the

4

following:

5

6

7

8

9

10

11

Peter B. Gonick
Callie A. Castillo
ATTORNEY GENERAL'S OFFICE
7141 CLEANWATER DR SW
PO BOX 40100
OLYMPIA WA 98504
peterg@atg.wa.gov
calliec@atg.wa.gov
StephanieL1@atg.wa.gov
SGOOlyEF@atg.wa.gov

Gregory J. Wong
Paul J. Lawrence
Claire E. McNamara
PACIFICA LAW GROUP LLP
1191 2ND AVE STE 2000
SEATTLE WA 98101
greg.wong@pacificalawgroup.com
paul.lawrence@pacificalawgroup.com
claire.mcnamara@pacificalawgroup.com
tricia.okonek@pacificalawgroup.com
dawn.taylor@pacificalawgroup.com

12

Attorneys for State Defendants

13

Attorneys for Intervenor-Defendant
Campaign to Prevent Fraud and Protect
Seniors

14

Under the laws of the United States of America and the state of Washington, the undersigned

15

hereby declares, under the penalty of perjury, that the foregoing statements are true and correct to the best

16

of my knowledge.

17

Signed at Seattle, Washington, this 18th day of July, 2018.

18

19

*s/ Gaye Johnson*
Gaye Johnson, Legal Assistant
gaye.johnson@millernash.com

20

21

22

23

24

25

26

MILLER NASH GRAHAM & DUNN LLP
ATTORNEYS AT LAW
T: 206.624.8300 | F: 206.340.9599
PIER 70
2801 ALASKAN WAY, SUITE 300
SEATTLE, WASHINGTON  98121

4833-6815-9849.4