UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BRADLEY BOARDMAN, et al.,

                    Plaintiffs,

        v.

JAY R. INSLEE, et al.,

                    Defendants

    and

CAMPAIGN TO PREVENT FRAUD
AND PROTECT SENIORS,

        Defendant-Intervenors.

CASE NO. C17-5255 BHS

ORDER GRANTING
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT,
INTERVENOR-DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT, AND DENYING
PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on Defendants Governor Jay R. Inslee,

Patricia Lashway, Director of the Washington Department of Social and Health Services

("DSHS"), and Ross Hunter, Director of the Washington Department of Early Learning's ("DEL") (collectively "State") motion for summary judgment, Dkt. 47, Defendant-Intervenors the Campaign to Prevent Fraud and Protect Seniors's ("Campaign") motion for summary judgment, Dkt. 48, and Plaintiffs Bradley Boardman ("Boardman"), Deborah Thurber ("Thurber"), Shannon Benn ("Benn"), and Freedom Foundation's ("Freedom Foundation" or "the Foundation") (collectively "Plaintiffs") cross-motion for summary judgment, Dkt. 50. The Court has considered the pleadings filed in support of and in opposition to the motions and the remainder of the file and hereby rules as follows:

## I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND

On June 30, 2014, the Supreme Court decided *Harris v. Quinn*, 134 S. Ct. 2618 (2014). *Harris*, in Plaintiffs' framing, held that in-home caregivers who are paid through the Medicaid program to provide in-home care for adults and children ("caregivers") "could not be forced to belong to or otherwise financially support a union because it violated their First Amendment rights." Dkt. 50 at 7. Plaintiffs explain that their interest in contacting caregivers in Washington arose "[i]mmediately after *Harris* was issued in 2014." Dkt. 50 at 7. On July 2, 2014, two days after the decision, the Freedom Foundation submitted public records requests to DSHS and DEL, seeking a list of caregivers from each. Dkt. 50 at 12 (citing Dkt. 6, Declaration of Maxford Nelson ("Nelson Decl."), at 3–4). DEL provided the requested list, and "[f]or over two and a half years, the Foundation has been using this list to reach Childcare Providers and informing them of their right to leave the union." Nelson Decl. at 4. DSHS "determined that the names of [caregivers] were disclosable information" but, according to Plaintiffs, "delayed

disclosure long enough to allow SEIU 775 to sue [DSHS] and the Foundation to prevent disclosure of the records." *Id*. at 4.[1] Though the suit was ultimately unsuccessful, the state trial court granted a temporary restraining order preventing disclosure and kept it in place until the appeal was resolved in 2016 in favor of the Foundation. Dkt. 50 at 12. Additional disputes over public records requests followed. Dkt. 50 at 12.

Washington voters enacted Washington State Initiative 1501 ("the Initiative") in the 2016 general election. Dkt. 47 at 4. The Initiative's text described its intent to:

> protect the safety and security of seniors and vulnerable individuals by (1) increasing criminal penalties for identity theft targeting seniors and vulnerable individuals; (2) increasing penalties for consumer fraud targeting seniors and vulnerable individuals; and (3) prohibiting the release of certain public records that could facilitate identity theft and other financial crimes against seniors and vulnerable individuals.

Dkt. 47-1 at 5, Text of the Initiative. Plaintiffs challenge Part Three of the Initiative, which amended Washington's Public Records Act, RCW Chapter 42.56 ("PRA"). The PRA provides for broad public access to state records, *see* WAC 44-14-01003, but state statutes have also created hundreds of exceptions. *See* Dkt. 49-5, Declaration of Gregory Wong, Ex. E Table of Exemptions from Public Records Disclosure.[2] The Initiative added an exception for "sensitive personal information of vulnerable individuals and sensitive personal information of in-home caregivers for vulnerable populations from inspection

---

[1] Two chapters of the Service Employees International Union ("SEIU") represent caregivers in Washington State: SEIU 775 and SEIU 925. Dkt. 50 at 7.

[2] As the Campaign explains "[s]ome exemptions have obvious policy bases, such as for the identity of victims or witnesses of crime, while others are less obvious, such as information in commercial fertilizer reports and personal information of individual American ginseng growers and dealers." Dkt. 48 at 18 (citing RCW 42.56.240(2), 42.56.380(2), 42.56.380(6)).

and copying" under the Act, and defined sensitive personal information to include names, in addition to addresses, GPS coordinates, telephone numbers, email addresses, social security numbers, driver's license numbers, "or other personally identifying information." Dkt. 47-1 10.

Neither party provides an explicit comparison of which identifying data points were available prior to the passage of the Initiative which are now not available.[3] Based on the Court's examination of the text of RCW 42.56.250(4), "[r]esidential addresses, residential telephone numbers, personal wireless telephone numbers, personal electronic mail addresses, social security numbers, and emergency contact information of employees or volunteers of a public agency" in personnel records or public employment related records have been excluded from public inspection and copying since at least 2006,[4] and driver's license numbers and identicard numbers have been excluded since 2014.[5] Comparing this information to § 8(2)(b) of the Initiative, it appears that for caregivers, the only additional information the Initiative withholds is their names. *See* Dkt. 47-1 10.

The Initiative continues to allow some entities to access caregiver identities, including the certified bargaining representative under RCW 41.56.080, *see* § 11(d), parties to contracts with the state where the contract requires disclosure, *see* § 11(f), or

---

[3] Plaintiffs argue the only "effective change was to keep non-preferred entities and individuals such as Plaintiffs from learning the names of the [caregivers]." Dkt. 50 at 6.

[4] *See* 2006 Wash. Sess. Laws ch. 209 § 6 (recodifying and making technical corrections to public disclosure law).

[5] *See* 2014 Wash. Sess. Laws ch. 106 § 1.

entities under contract with the state to provide services to or conduct research about vulnerable residents, *see* § 11(g).

The argument for the Initiative in the Voters' Guide noted that seniors and vulnerable people were particularly at risk of identity theft and other financial exploitation or scams. Dkt. 49-2 at 6–7. The argument against the Initiative in the Guide claimed the Initiative's goal "is to rewrite the Public Records Act to prevent in-home caregivers and childcare providers from learning they no longer can be forced to pay dues to the union." *Id.*

On April 5, 2017, Plaintiffs filed a complaint against the State alleging that the Initiative violates Plaintiffs' rights to free speech and free association under the First Amendment, and right to equal protection of the laws under the Fourteenth Amendment, seeking a permanent injunction enjoining the State from enforcing the Initiative. Dkt. 1, ¶¶ 89–132.

Also on April 5, Plaintiffs filed a motion for a temporary restraining order against the State, seeking to enjoin the Initiative. Dkt. 2. Plaintiffs raised their First Amendment and Equal Protection claims, as well as Thurber and Benn's desire to call an election to replace SEIU 925 with another union for child caregivers. Dkt. 2 at 12. To call an election at that time, they would have had to "convince 30% of Childcare Providers to call for an election during the month of April" to meet the deadline, sixty days prior to the expiration of the then-current collective bargaining agreement for child caregivers. Dkt. 2 at 12. On April 10, 2017 the State responded, Dkt. 15, and the Court held a hearing. The Court denied the temporary restraining order due to Plaintiffs' failure to

show a likelihood of success on the merits and delay in bringing the motion. Dkt. 21.

Also on April 10, the Campaign filed a motion to intervene as a defendant. Dkt. 17. On

May 11, 2017, the Court granted the Campaign's motion to intervene. Dkt. 31.

On July 17, 2018, the State and the Campaign each filed motions for summary

judgment. Dkts. 47, 48. On July 18, 2018, Plaintiffs filed a cross-motion for summary

judgment. Dkt. 50. On August 6, 2018, the parties responded. Dkts. 60, 61, 63.  On

August 10, 2018, the parties replied. Dkts. 65, 67, 68.[6]

## II.   DISCUSSION

In this case, the dispute centers on whether Part Three of the Initiative violates the

Constitution. Both sides agree the dispute is primarily legal rather than factual. Dkts. 47

at 3, 48 at 14, 63 at 7. The primary legal question is whether a statute enacted by

Washington voters is constitutional. As a threshold matter, legislative classifications are

presumed constitutional, and "the burden of showing a statute to be unconstitutional is on

the challenging party." *N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 17

(1988).

Regarding the merits, Plaintiffs assert two Equal Protection claims and three First

Amendment claims. The Court considers the First Amendment claims first, concluding

that Plaintiffs have failed to establish any violation of a fundamental right. Based on that

conclusion, the Court grants the State and the Campaign's motions for summary

---

[6] On November 30, 2018, the Campaign filed a notice of supplemental authority. Dkt. 71. Plaintiffs moved to strike the supplemental authority on December 5, 2018. Dkt. 72. The Campaign responded on December 12, 2018. The Court does not address the case updated in the Campaign's notice, and so does not address Plaintiffs' motion.

judgment on Plaintiffs' First Amendment claims and first Equal Protection claim, which is based on interference with a fundamental right. The Court then considers Plaintiffs' second Equal Protection claim under rational basis review and concludes that Plaintiffs have failed to establish any constitutional violation.

**A.      Summary Judgment Standard**

Summary judgment is proper only if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party is entitled to judgment as a matter of law when the nonmoving party fails to make a sufficient showing on an essential element of a claim in the case on which the nonmoving party has the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt"). *See also* Fed. R. Civ. P. 56(e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 253 (1986); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The determination of the existence of a material fact is often a close question. The Court must consider the substantive evidentiary burden that the nonmoving party must

meet at trial—e.g., a preponderance of the evidence in most civil cases. *Anderson*, 477 U.S. at 254; *T.W. Elec. Serv., Inc*., 809 F.2d at 630. The Court must resolve any factual issues of controversy in favor of the nonmoving party only when the facts specifically attested by that party contradict facts specifically attested by the moving party. The nonmoving party may not merely state that it will discredit the moving party's evidence at trial, in the hopes that evidence can be developed at trial to support the claim. *T.W. Elec. Serv., Inc*., 809 F.2d at 630 (relying on *Anderson*, 477 U.S. at 255). Conclusory, nonspecific statements in affidavits are not sufficient, and missing facts will not be presumed. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888-89 (1990).

**B.      First Amendment**

Plaintiffs allege that creating a PRA exception for caregiver identities interferes with Plaintiffs' exercise of free speech and association because the identity lists "are essential for both Plaintiffs and the Unions to engage in political speech with [caregivers]." Dkt. 1, ¶ 96. Plaintiffs rely on seven lines of doctrine to support their claim that the exception burdens their First Amendment speech and association rights: (1) methods of communication cases, (2) access to government cases,  (3) ballot access cases, (4) right to listen cases, (5) viewpoint discrimination cases, (6) overbreadth cases, and (7) freedom of association cases. The Court concludes that none of the authorities cited by Plaintiffs establishes that the Initiative burdens their First Amendment rights.

**a.      Methods of Communication**

Plaintiffs argue that the substantial Supreme Court precedent protecting picketing and door-to-door pamphlet distribution shows the First Amendment prohibits banning

access to a particular audience or a particular method of communication. Dkt. 50 at 21.

*See*, *e.g.*, *Martin v. City of Struthers*, 319 U.S. 141, 146–47 (1943) ("Freedom to distribute information to every citizen wherever he desires to receive it is so clearly vital to the preservation of a free society that, putting aside reasonable police and health regulations of time and manner of distribution, it must be preserved."); *Schneider v. State of New Jersey, Town of Irvington*, 308 U.S. 147, 164 (1939) ("[P]amplets have proved most effective in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people."). Plaintiffs also cite *Meyer v. Grant*, 486 U.S. 414 (1988), where the state impermissibly prohibited paying petition circulators, to support the proposition that courts find burdens on speech when laws restrict the number of voices putting forward a particular message or reduce speakers' "ability to make the issue a statewide discussion." Dkt. 50 at 19 (citing 486 U.S. at 421–22). Plaintiffs convincingly establish that the Supreme Court values affordable methods of distributing speech, but their cited authorities do not support the proposition that the First Amendment compels the government to disclose information to help speakers identify their target audience. Unlike the cited authorities, the Initiative does not burden any methods of communication Plaintiffs may use to speak to caregivers once Plaintiffs have identified them—Plaintiffs may canvass, hire paid canvassers, distribute pamphlets, make speeches, advertise and hold meetings, picket, or send mailers to distribute their speech. Thus, Plaintiffs have failed to establish any unconstitutional restriction on a method of communication.

Plaintiffs also cite *Police Department of Chicago v. Mosely*, 408 U.S. 92, 95–96 (1972) (city ordinance allowing only labor-based picketing near schools) and *Carey v. Brown*, 447 U.S. 455 (1980) (state law exempting labor-based picketing from ban on picketing at dwelling-places) for the proposition that differential treatment of union and non-union speech violates the Equal Protection Clause. Dkt. 50 at 27–28.[7] In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983) ("*Perry Education*"), the rival union cited *Mosely* and *Carey* for the proposition that the certified teacher's union's exclusive access to teacher mailboxes violated the First Amendment and the Equal Protection Clause. *Id.* at 41, 54. There, the Supreme Court distinguished *Mosely* and *Carey*, saying "[t]he key to those decisions . . . was the presence of a public forum. In a public forum, by definition, all parties have a compelling right of access." *Id.* at 54–55.

In this case, Plaintiffs have failed to establish a "forum" wherein the alleged discrimination is occurring. Plaintiffs have failed to cite, and the Court is unaware of any, authority for the proposition that a list of names is either a public or private forum for communication. Unlike a set of mailboxes allowing a speaker to insert pamphlets, a list of names simply identifies individuals. Thus, Plaintiffs' reliance on *Mosely* and *Carey* is misplaced. Even if the list could be considered a forum, the Supreme Court has held that "when government property is not dedicated to open communication the government may—without further justification—restrict use to those who participate in the forum's official business," particularly when substantial alternative channels remain open for the

---

[7] The Court will also address Plaintiffs' concerns about distinguishing between union and non-union speech in its discussion of viewpoint discrimination.

rival union. *Id.* at 53. Plaintiffs fail to establish that the list is dedicated to open communication or that they would participate in the list's official business.  Thus, the state may, "without further justification," restrict access to the list.  *Id.*

Plaintiffs also rely on *Perry Education* in arguing that they have a right to access government information identifying caregivers because, they believe, there is no other simple or inexpensive way to identify caregivers. Dkt. 63 at 9–10. Plaintiffs, however, fail to establish a fundamental constitutional right based on the alleged difficulty of their intended task. Similar to *Perry Education*, Plaintiffs fail to show that their ability to "communicate" with their intended audience is seriously impinged by Part Three of the Initiative. 460 U.S. at 53 ("There is no showing here that [the rival union's] ability to communicate with teachers is seriously impinged by the restricted access to the internal mail system."). The Court recognizes that Plaintiffs would be more easily able to contact the audience if they had access to the list of identities, but speaking or communicating and contacting a specific recipient are distinctly different acts. Therefore, Plaintiffs' reliance on these methods of communication cases is without merit.

### b.    Government Access

Perhaps the most vehement disagreement between the parties is about how to properly apply the First Amendment doctrines on access to government records or proceedings to the facts of this case. Defendants argue this case should follow *Los Angeles Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 34 (1999), *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978), and related cases, which firmly disavow the existence of a government obligation under the First Amendment to disclose

government information or records.  Plaintiffs rely on *Press-Enterprise v. Superior Court*, 478 U.S. 1 (1986) and its progeny, which developed a two-part test to consider when "public access to criminal trials and the selection of jurors is essential to the proper functioning of the criminal justice system." *Id.* at 7, 11–12. Three circuits and multiple district courts have applied these rules more broadly. *See Leigh v. Salazar*, 677 F.3d 892, 899 n.5 (9th Cir. 2012) (collecting cases). The Court will discuss these cases in turn.

 ***Los Angeles Police Dep't.*** In *Los Angeles Police Dep't*, California passed a statute requiring those placing public records requests for names and addresses of recently arrested individuals to "declare that the request is being made for one of five prescribed purposes, and that the requester also declare that the address will not be used directly or indirectly to sell a product or service." 528 U.S. at 34. A private company in the business of providing the names to attorneys and insurance companies brought a facial challenge. *Id.* The Supreme Court explained

> Petitioner [the Los Angeles Police Department] contends that the section in question is not an abridgement of anyone's right to engage in speech, *be it commercial or otherwise*, but simply a law regulating access to information in the hands of the police department. We believe that, at least for purposes of facial invalidation, petitioner's view is correct.

*Id.* at 40 (emphasis added). The Court further reasoned "California could decide not to give out arrestee information at all without violating the First Amendment." *Id.* (citing *Houchins v. KQED, Inc.*, 438 U.S. 1, 14 (1978)). [8]

---

[8] The Court notes that *Los Angeles Police Department* contained multiple concurring opinions, none of which dispute the cited reasoning.

In *Houchins*, in response to a news station's First Amendment claim for access to jails to interview inmates following reports of a prisoner's suicide, the Supreme Court plurality explained that despite the media's First Amendment right to gather information, "[t]his Court has never intimated a First Amendment guarantee of a right of access to all sources of information within government control." 438 U.S. at 9. The Court reasoned that "[t]here is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information." *Id.* at 14.[9] Justice Stewart, concurring with the *Houchins* plurality, stated that "[t]he First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government, nor do they guarantee the press any basic right of access superior to that of the public generally." *Id.* at 16 (Stewart, J., concurring). In a more recent case, *Entler v. McKenna*, the Ninth Circuit affirmed the district court's dismissal of a state prisoner's claim that a state official had violated his constitutional rights by lobbying for amendments to Washington's Public Disclosure Act, stating "there is no constitutional right to public disclosure of government documents." 487 Fed. Appx. 417, 417–418 (9th Cir. 2012). These precedents provide substantial support for Defendants' argument that

---

[9] The plurality went on at some length on this topic, explaining "Petitioner cannot prevent respondents from learning about jail conditions in a variety of ways, albeit not as conveniently as they might prefer. Respondents have a First Amendment right to receive letters from inmates criticizing jail officials and reporting on conditions. Respondents are free to interview those who render the legal assistance to which inmates are entitled. They are also free to seek out former inmates, visitors to the prison, public officials, and institutional personnel, as they sought out the complaining psychiatrist here." *Houchins*, 438 U.S. at 15 (internal citations omitted).

"laws restricting public access to records do not implicate the First Amendment at all."
Dkt. 47 at 3.

**Press-Enterprise.** The *Press-Enterprise* test, developed in application to the criminal justice system, asks "(1) whether historical experience counsels in favor of public access, and (2) whether public access would play a 'significant positive role in the functioning of the particular process in question.'" 478 U.S. at 8. In recent years, circuit and district courts have applied this test when they consider "attempts to access a wide range of civil and administrative government activities." *Leigh*, 677 F.3d at 899.

Plaintiffs highlight a Ninth Circuit case applying the test, *Cal-Almond, Inc. v. U.S. Dept. of Agriculture*, 960 F.2d. 105, 109–110 (9th Cir. 1992), where an almond handler sought the identities of producers who would vote in a marketing referendum in order to lobby them. *Id*. at 106–07. The Court concluded that a serious constitutional question might exist if the statue did not allow the disclosure. *Id*. at 109. In applying the doctrine of constitutional avoidance, the Circuit reasoned that a tradition of public access to voter lists likely exists, the legislation in question was open to such construction, and therefore "it is reasonable to assume that Congress intended the lists of eligible voters to be a matter of public record." *Id*. at 110.

While this reasoning is dicta, Plaintiffs are correct that the posture of the *Cal-Almond* parties is similar to the case at bar to the extent that Plaintiffs Thurber and Benn seek to lobby caregivers to vote for their alternate union. Dkt. 63 at 13. However, Plaintiffs do not meet their burden to present precedent or historical fact showing a tradition of public access to the identities of public employees or union members to

satisfy the first part of the *Press-Enterprise* test. *See* Dkt. 63 at 13–14. In considering that

factor, the *Press-Enterprise* court described the history of criminal trials dating back to

the Norman Conquest, noting that "even our modern procedural protections have their

origin in the ancient common-law principle which provided, not for closed proceedings,

but rather for rules of conduct for those who attend trials." 478 U.S. at 8 (internal citation

omitted). Plaintiffs cite *Harris* and *Janus* on the "rights of all government employees not

to be compelled to finance union speech." Dkt. 63 at 14 (citing 134 S. Ct. 2618 and 138

S. Ct. at 2464). In *Harris*, the Supreme Court specifically distinguished factual

circumstances like the one at bar, saying "Petitioners do not contend that they have a First

Amendment right to form a rival union. Nor do they challenge the authority of [the

certified union] to serve as the exclusive representative of all the personal assistants in

bargaining with the State." 134 S. Ct. at 2640. Plaintiffs quote the Court's statement in

*Janus* that "[d]esignating a union as the employees' exclusive representative substantially

restricts the rights of individual employees . . . ." but omit the second half of the Court's

reasoning, that this restriction supports the union's obligation to provide equal

representation for all employees in the bargaining unit regardless of their union

membership. 138 S. Ct. at 2460. The Court agrees with Defendants that these recent cases

do not establish a "long-recognized tradition of access to public records" or to lists of

government employee identities. Dkt. 67 at 5.

Addressing the second half of the *Press-Enterprise* test, whether public access

plays a significant positive role in the functioning of the particular process in question,

Plaintiffs argue public access to caregiver identities will disrupt the unions' "monopoly"

on communication with the caregivers. Dkt. 63 at 14 ("IPs themselves, alternative Unions, or entities like the Freedom Foundation are all prevented from being able to speak to IPs."). Cases applying *Press-Enterprise* outside the criminal justice context have involved government criminal or civil enforcement, information about public figures or government action, or government meetings. *See Leigh*, 677 F.3d at 899 n.5 (collecting cases). These cases appear united by recognized traditions of citizen government oversight.

Plaintiffs do not clarify what process they believe would benefit from increased public access, whether that is caregiver union elections, caregiver participation in collective bargaining, or societal political debate about the value of collective bargaining between caregivers and the state. To the extent Plaintiffs believe it is too difficult to decertify caregiver unions, and public access to caregiver identities would significantly improve union elections, those arguments would be appropriate in a challenge involving the complete context of the state's collective bargaining laws.[10] That is not the case here. Additional historical analysis and specificity could present a more compelling case, but on the record before the Court, an unestablished tradition of public access combined with a vague positive impact on an unspecified process does not support mandated access to

---

[10] For example, there appear to be different thresholds of interest required to initiate representation elections for different types of employees—in an unfair labor practice complaint filed by Thurber's Pacific Northwest Child Care Association ("PNWCCA") with the Washington Public Employment Relations Commission against the State of Washington, PNWCCA argues that the 30 percent showing of interest required for a representation election is too onerous for child caregivers, particularly when compared to the 10 percent showing required for adult caregivers under WAC 391-25-051. Dkt. 47-1 at 39.

government records under *Press-Enterprise*. Because Plaintiffs have not satisfied the *Press-Enterprise* test, and *Los Angeles Police Dep't* and related cases declare firmly that legislative policy decisions on public records disclosure do not generally implicate fundamental rights under the First Amendment, the Court concludes that Plaintiffs have failed to establish infringement of fundamental First Amendment rights.

### c.     Ballot Access

Plaintiffs cite one ballot access case, *Bullock v. Carter*, 405 U.S. 134 (1972) for the proposition that the First Amendment "broadly protects not only the expression of speech but also the methods used to facilitate speech," Dkt. 50 at 19, and another, *Williams v. Rhodes*, 393 U.S. 23 (1968) for the proposition that a facially neutral law burdening associational rights must be justified by a compelling state interest. Dkt. 63 at 21. *Bullock* found that the state had created "a system that utilizes the criterion of ability to pay as a condition to being on the ballot, thus excluding some candidates otherwise qualified and denying an undetermined number of voters the opportunity to vote for candidates of their choice" in contravention of equal protection. 405 U.S. at 149. *Williams* held that strict procedural requirements for new parties to place candidates on the presidential election ballot burdened the right to cast effective votes and the right to associate for political purposes and could not survive strict scrutiny. 393 U.S. at 30. However, while these cases in dicta make many persuasive statements about the foundational importance of political organizing and the duty of government to refrain from burdening such organizing, they do so in the context of election to public office. As the Supreme Court explains in *Anderson v. Celebrezze*, 460 U.S. 780, 793 (1983) "[o]ur

ballot access cases . . . focus on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process." Plaintiffs do not seek access to the electoral process, and do not cite authority applying election law doctrine to union elections, which have their own complex set of regulations and oversight.

### d.    Right to Listen

Plaintiffs argue that withholding caregiver identities interferes with the caregivers' right to hear Plaintiffs' speech. Dkt. 50 at 24–26 (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 390 (1969) ("right of the public to receive suitable access to social, political, esthetic, moral, and other ideas"); *Thomas v. Collins*, 323 U.S. 516, 534 (1945) (right of workers to "hear what [the labor organizer] had to say); *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 143–44 (1943) ("The ordinance does not control anything but the distribution of literature, and, in that respect, it substitutes the judgment of the community for the judgment of the individual householder.")).  Defendants "do[] not dispute that the corollary to freedom of speech is the right to receive information," but argue that Plaintiffs' reliance on caselaw restricting a means of communication to a particular audience is misplaced. Dkt. 60 at 10. The right to receive information is derivative of the right to speak: that is, "where a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Counsel, Inc.*, 425 U.S. 748, 756 (1976). Because

the Court finds Plaintiffs have not established infringement of their free speech, the Court finds no derivative burden on caregivers' right to listen.[11]

### e. Viewpoint Discrimination

Plaintiffs allege that "Part III of [the Initiative] favors the Union's political and ideological viewpoints because the [I]nitiative exempts unions from its coverage . . . . Because the Initiative only burdens the speech of individuals and entities with views divergent from those of the Union, it is viewpoint-discriminatory." Dkt. 1, ¶ 116.

Even if Plaintiffs' records requests did constitute speech, the Initiative still does not discriminate based on viewpoint by disclosing caregiver identities to the certified collective bargaining representative and not Plaintiffs. As the Supreme Court explained in *Perry Education*, when the rival union alleged access to teacher mailboxes for the certified union constituted viewpoint discrimination, "it is more accurate to characterize the access policy as based on the *status* of the respective unions rather than their views." 460 U.S. at 49.

Plaintiffs are not the certified representative. The Initiative discloses caregiver identities to the certified bargaining representative under RCW 41.56.080, or parties to contracts with the state where disclosure is required or the entity is providing services to vulnerable residents or conducting research about them. Dkt. 47-1 at 11–12. These are all status distinctions, based on a contractual relationship or legal obligation to provide

---

[11] The Court further notes that Plaintiffs did not include this claim in their complaint, *see* Dkt. 1, nor explain how this claim impacts the rights of Plaintiffs actually before the court, as opposed to caregivers in Washington generally, whom Plaintiffs do not claim to represent. *See* Dkts. 50, 63, 65.

collective bargaining services, and do not involve "unbridled discretion in the hands of a

government official or agency" as found unconstitutional in *City of Lakewood v. Plain*

*Dealer Publishing Co.*, 486 U.S. 750 (1988) or make a content-based distinction between

topics of speech, *see Boos v. Berry*, 485 U.S. 312 (1988) (striking down ordinance

prohibiting signs criticizing embassy within 500 feet of the embassy). The *Janus* court's

reasoning that an exclusive representative designation comes with "special privileges" for

the union like "obtaining information about employees" further supports a conclusion

that providing access to information for the certified bargaining representative and not for

others would not represent a First Amendment violation. 138 S. Ct. at 2467. Therefore,

Plaintiffs' claim of viewpoint discrimination is unfounded, and the Court grants summary

judgment for Defendants on Plaintiffs' Claim Three.

### f.      Overbreadth

Plaintiffs allege Part Three of the Initiative is overbroad, its "real, and sole,

purpose is to silence the Plaintiffs' viewpoints," and its "restrictions on access to Provider

lists bears [sic] a close and obvious nexus to Plaintiffs' speech." Dkt. 1, ¶¶122–123.

Plaintiffs cite *United States v. Stevens*, 559 U.S. 460 (2010) to define the concept of

overbreadth, describing legislation where "a substantial number of its applications are

unconstitutional, judged in relation to the statue's plainly legitimate sweep" but proceed

to discuss *City of Lakewood*, 486 U.S. 750, *Arcara v. Cloud Books, Inc*., 478 U.S. 697

(1986), and *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575

(1983), cases not typically associated with the overbreadth doctrine.[12] The Court will address Plaintiffs' arguments on the cases discussed.

Plaintiffs argue that the Initiative could fall under the Supreme Court's "course of conduct" analysis, *see* Dkt. 50 at 26, where the Court "has applied First Amendment scrutiny to a statute regulating conduct which has the incidental effect of burdening the expression of a particular political opinion," *Arcara*, 478 U.S. at 702 (citing *United States v. O'Brien*, 391 U.S. 367 (1968)). Applying this test to the burden on speech posed by closing an adult bookstore due to prostitution activity, the Supreme Court found "unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case manifests absolutely no element of protected expression." *Arcara*, 478 U.S. at 705. While the distinction between prostitution and books may be more stark than the distinction between records requests and mailer distribution, the Court is not convinced Plaintiffs have shown that their records requests constitute expressive activity. There is no doubt Plaintiffs wish to identify the caregivers so they can speak to them. But Plaintiffs do not suggest they place public records requests for the purpose of the *request* encouraging the caregivers to leave their union or join an alternative, nor do they suggest they are demonstrating their opposition to state policy through placing public records requests.

---

[12] Cases and concepts typically associated with overbreadth include *Schad v. Borough of Mt. Emphraim*, 452 U.S. 61, 66 (1981) (town ordinance prohibited live entertainment to target nude dancing, but swept in plays, concerts, and musicals), *Broadrick v. Oklahoma*, 413 U.S. 601, 615–16 (1973) (state law prohibiting political activity by government employees not facially overbroad on potential to sweep in political button-wearing or bumper sticker displays), or *Houston v. Hill*, 482 U.S. 451 (1987) (ordinance prohibiting interrupting police in course of their duties swept in impermissible amount of protected speech).

They seek the records so they can more efficiently identify their target audience to direct their canvassing or mailer distribution. In sum, Plaintiffs fails to establish that they express their position by placing the records request.

*Minneapolis Star* and *City of Lakewood* are similarly inapposite, involving, respectively, a tax on newsprint and ink, 460 U.S. at 585, and a requirement for a permit granted at the mayor's discretion to place newsracks on public property, 486 U.S. at 754. These cases both address the Supreme Court's particular concern about legislation "directed narrowly and specifically at expression or conduct commonly associated with expression: the circulation of newspapers." *See* Dkt. 50 at 26 (citing *City of Lakewood*, 486 U.S. at 760). Plaintiffs fail to establish that the Initiative is invalid on the basis of overbreadth or otherwise violates the First Amendment, and therefore the Court grants summary judgment for Defendants on Plaintiffs' Claim Four.

### g. Freedom of Association

Plaintiffs Thurber and Benn allege violation of their freedom of association, explaining that "[w]ithout the list of Childcare Providers, [they] cannot exercise their fundamental associational rights" to decertify SEIU "and are permanently subjected to an association with SEIU 925." Dkt. 1, ¶ 130. Plaintiffs cite *Thomas*, 323 U.S. at 519, 522 n.2, where the Supreme Court found a Texas law requiring an organizer's card for union solicitation as applied to a speech by the president of a large national union was a prior restraint on his right to free speech and free association. Dkt. 50 at 27. There, the court reasoned that "[t]he right thus to discuss, and inform people concerning, the advantages and disadvantages of unions and joining them is protected not only as part of free speech,

but as part of free assembly." *Id.* at 532. Plaintiffs also cite *State Emp. Bargaining Agent Coal. v. Rowland*, 718 F.3d 126, 132 (2nd Cir. 2013) where labor organizations and state employees alleged the state "discriminatorily la[id] off only union members when reducing the state's work force." Dkt. 50 at 27. There, the Second Circuit reasoned that "[c]onditioning public employment on union membership, no less that on political association, inhibits protected association and interferes with government employee's freedom to associate," thus subjecting "employment decisions based on union membership" to strict scrutiny. *Rowland*, 718 F.3d at 133–35. Here, as discussed above, the operative restriction is of public records, not speech or discussion. Further, the Initiative's limits on access to public records are not employment decisions.

The Campaign highlights that traditional First Amendment associational protections include the right to refuse to disclose membership lists for advocacy groups, *NAACP v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 462 (1984), and right to refuse entry of undesired individuals into an association, *Roberts v. United States Jaycees*, 468 U.S. 609, 623 (1984) and correctly points out that a government obligation to assist a challenger union does not fall into any of these categories. Dkt. 48 at 30.

Finally, Plaintiffs cite *Janus* to support their argument that associational rights are implicated in exclusive union representation. However, as Defendants clarify, *Janus* held union agency fees from nonmembers constituted compelled speech in violation of First Amendment. 138 S. Ct. 2486. It did not hold, as Plaintiffs argue, that exclusive union representation is compelled association in violation of the First Amendment, or that such a "compelled association" creates a state obligation "to disclose to them with whom they

are associating." Dkt. 63 at 11. Plaintiffs do not cite to other authority establishing that exclusive representation of a collective bargaining unit constitutes an impermissible restriction on the right to association.

The Court is persuaded by Defendants' argument that despite the long and highly litigated history of labor relations laws such as the federal Labor-Management Relations Act, 29 U.S.C § 7 *et seq*., and the Washington Public Employees' Collective Bargaining Act, RCW Chapter 41.56, neither party has cited authority requiring an employer to disclose the identities of the members of the collective bargaining unit to a group wishing to associate with them. Dkt. 47 at 24. As previously noted, to the extent Plaintiffs Thurber and Benn wish to decertify the existing child caregiver union and believe the Initiative's disclosure provision makes that effort too onerous, they fail to establish that the Initiative infringes their First Amendment right to freedom of association. Therefore, the Court grants summary judgment for Defendants on Plaintiffs' Claim Five.

**C.    Equal Protection**

Plaintiffs bring two equal protection claims: first, that the Initiative interferes with their fundamental rights of speech and association and therefore is subject to heightened scrutiny under the Equal Protection Clause, and second, that the Initiative makes an impermissible distinction among similarly situated records requesters and was motivated by animus, thus failing even rational basis review. Dkt. 1, ¶¶ 89–109. Plaintiffs allege the Initiative is unconstitutional both facially and as applied to Plaintiffs. *Id.*

### 1. Interference with Fundamental Rights

Plaintiffs allege that the Initiative "significantly interferes with citizens' fundamental rights and . . . does not pass strict scrutiny." Dkt. 1, ¶ 90. "[E]qual protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class." *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Plaintiffs do not allege the classification burdens a suspect class, *see* Dkt. 1, ¶ 109 ("Defendants treat similarly-situated, non-suspect class groups differently"), and the Court found no interference with Plaintiffs' fundamental First Amendment rights. Therefore, the Court finds no equal protection violation that requires strict scrutiny, and grants summary judgment for Defendants on Plaintiffs' Claim One.

### 2. Animus and Similarly Situated Groups

Plaintiffs allege they are similarly situated to the certified collective bargaining representative permitted to access caregiver identities under § 8(d) of the Initiative, because "both are groups and individuals that engage in constitutionally protected speech with [caregivers]," and so should be afforded equal access to caregiver identities. Dkt. 1, ¶ 101. Plaintiffs further allege the Initiative "was drafted with the intention to silence the Foundation's political speech and thus harm the Foundation" and was "motivated solely by [the unions'] animus toward the Foundation, its outreach efforts, and its political speech." Dkt. 1, ¶ 106, 107.

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,'

which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202 (1982)). "[I]f a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).

Rational basis review requires two steps of analysis. First, "[d]oes the challenged legislation have a legitimate purpose?" *Western and Southern Life Ins. Co. v. State Bd. of Equalization of Cal.*, 451 U.S. 648, 668 (1981). A "bare . . . desire to harm a politically unpopular group" can never constitute a legitimate government purpose. *Romer*, 517 U.S. at 634 (quoting *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973)). Further, "[t]he State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446 (internal citations omitted).

Second, "[w]as it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?" *Western and Southern Life Ins. Co.*, 451 U.S. at 668. Plaintiffs, as "those challenging the legislative judgment" have the burden to "convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decisionmaker." *Vance v. Bradley*, 440 U.S. 93, 111 (1979) (upholding mandated retirement at age 60 for Foreign Service employees, in contrast to age 70 for Civil Service employees) (collecting cases). Challengers may present evidence that the legislation is irrational, but "they cannot prevail so long as 'it is evident from all the

considerations presented to [the legislature], and those of which we make take judicial notice, that the question is at least debatable.'" *Minn v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464 (1981) (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 153–54 (1938)). The Ninth Circuit explains that the equal protection doctrine outside infringement on fundamental rights and discrimination against suspect classes, asks "[courts] to *imagine any conceivable basis* supporting a law, even if not advanced by the government." *Fowler Packing Company, Inc. v. Lanier*, 844 F.3d 809, 815 n.3 (9th Cir. 2016) (emphasis added). Here, the classification at issue is between the certified collective bargaining representative and Plaintiffs, who would like to receive the list of caregiver identities for political speech or to elect an alternative union.

### a. Similarly Situated Groups

Plaintiffs Boardman and Freedom Foundation seek to communicate with caregivers about their "*Harris* rights." Dkt. 50 at 10–11. The certified collective bargaining representative has a legal responsibility to negotiate on behalf of all caregivers with the state employer about their employment. *See* RCW 41.56.080. Plaintiffs Boardman and Freedom Foundation do not assert that they have or wish to assume this legal responsibility. Therefore, Plaintiffs Boardman and Freedom Foundation are not similarly situated to the certified collective bargaining representative. Because these plaintiffs are not similarly situated to those given the benefit they seek, a classification treating them differently does not violate the Equal Protection Clause on that basis.

Plaintiffs Thurber and Benn assert that they wish to communicate with child caregivers about issues relevant to the profession, and that they wish to call an election to

replace SEIU 925 with their association, the PNWCCA. Dkt. 50 at 10. To the extent that they wish to discuss concerns with the caregivers, they are not similarly situated to the certified collective bargaining representative. To the extent that they wish to assume the position of certified bargaining representative vis-à-vis the state employer, their circumstance is similar, but they are not the certified representative. They are a rival union. Courts recognize that certification of an exclusive representative is a permitted component of collective bargaining regulatory structures, which may include differential access to employees in the bargaining unit. *See, e.g.*, *Perry Education*, 460 U.S. at 49 (differential access to teacher mailboxes based on status or lack thereof as certified bargaining representative does not violate the Equal Protection Clause); *Janus*, 138 S. Ct. at 2467 (unions will still seek exclusive representative designation without mandated agency fees because designation often affords them "special privileges, such as obtaining information about employees"). Therefore, the Initiative's distribution of caregiver identities to the certified bargaining representative but not Plaintiffs does not violate the Equal Protection Clause on the basis of impermissible discrimination among similarly situated groups.

### b. Animus

Next, the Court considers Plaintiffs' argument that the Initiative's decision to withhold previously available caregiver identities from public records requests raises an "inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *See* Dkt. 50 at 28 (citing *Romer*, 517 U.S. at 634). Plaintiffs argue that the Initiative targets their public records requests and was "motivated by animus

against Plaintiffs and their message." Dkt. 50 at 29. The stated purpose of Part Three of the Initiative is to protect sensitive personal information about in-home caregivers for vulnerable populations "because its release could facilitate identity crimes against seniors, vulnerable individuals, and the other vulnerable populations that these caregivers serve." Dkt. 47-1 at 10. The State also argues that protecting the privacy of the caregivers themselves is another legitimate governmental purpose promoted by withholding caregiver identities. Dkt. 47 at 16 (citing *Wash. Pub. Emp. Ass'n v. Wash. State Ctr. For Childhood Deafness & Hearing Loss*, 1 Wn. App. 225, 243 (2017) (state constitution provides expectation of privacy for a public employee's date of birth in combination with his or her name), *review granted*, 190 Wn.2d 1002 (2018)).

Plaintiffs do not contest that preventing identity crimes against seniors and vulnerable individuals is a legitimate government purpose, *see Western and Southern Life Ins. Co.*, 451 U.S. at 668, but argue that the impact of a PRA exception on these crimes is speculative, and caregiver privacy is an after-the-fact justification, supporting an inference that the true motivation was animus. Dkt. 63 at 11. "When the politically unpopular group is not a traditionally suspect class, a court may strike down the challenged statute under the Equal Protection Clause if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's enactment." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir. 2018) (internal quotation omitted) (describing this standard as "searching scrutiny") Therefore, the Court considers whether the legislation's method of action is "rationally

related to the achievement" of the legitimate purpose. *Clover Leaf Creamery Co.*, 449 U.S. at 462–63.

The Initiative does not explicitly articulate how withholding caregiver identities will protect vulnerable individuals. The State argues that caregivers often work in their client's homes, Dkt. 47 at 16 (citing Dkt. 1, ¶ 20), and as the Initiative's general legislative findings state in § 4, these vulnerable clients frequently have "less ability to protect themselves . . . and can be targeted using information available through public sources, including publically available information that identifies such individuals or their in-home caregivers." *Id.* (citing Dkt. 47-1 at 7). The Campaign's motion for summary judgment cites Washington enforcement efforts to prevent fraud and identity theft and notes that the Attorney General's Fraud Fighters consumer education program was established "specifically to assist the elderly because they more often are targeted for fraud." Dkt. 48 at 10. Voters received communications from the Campaign with details about the rates of financial fraud committed against seniors, the likelihood of fraud against seniors going unreported, and headlines from local news stories about cases of seniors losing their savings to fraud. Dkt. 62-1 at 4–5. While this evidence is thin, it is analogous to legislative history discussing the "situations in which agricultural production facilities have been, or may be, harmed as a result of a misrepresentation leading to the acquisition of records" in *Animal Legal Defense Fund*, 878 F.3d at 1201.

These points support an inference that withholding a list of identities that would pinpoint homes containing vulnerable seniors reduces the amount of publically available information that could be used identify targets for financial fraud and identity theft,

potentially reducing the rate at which seniors fall victim to these crimes. Plaintiffs argue that the purpose of protecting seniors and vulnerable individuals from fraud is "based on nothing more than speculation that some person might file a [public records request] and (now on record for requesting the information) commit identity theft or fraud." Dkt. 50 at 29. Plaintiffs argue that the law will not achieve its purpose of preventing identity theft because caregiver contact information was already exempted from disclosure, supporting an inference that the "only true effect of [the Initiative's Public Records Act] provisions was to preclude anyone other than approved groups from being able to learn the identity of [caregivers]." Dkt. 50 at 13.

However, Plaintiffs anticipate being able to "access the individual [caregivers] through mail directed to them and door-to-door canvassing" once they are provided a list of caregiver names. Dkt. 50 at 24. Plaintiffs suggest wrongdoers would not want to identify themselves by placing a public records request, but do not explain why legislative reasoning that identity thieves could also find direct contact information once they have a list of likely targets is irrational or speculative. Plaintiffs affirm that the primary work location for many caregivers is their own homes. *See* Dkt. 64, Second Declaration of Matt Hayward at 3, 4. If a caregiver's identity leads easily to address information to support direct mail or canvassing efforts, it appears rational for the voters to reason that protecting caregiver identities removes an avenue that could be abused to identify homes with vulnerable residents. Identity theft and financial fraud against seniors is undoubtedly a real problem. The Court finds that "it is evident from all the considerations presented to [the legislature]," or here, to the general voting public, that on

the efficacy of reducing publically available information about caregivers to reduce

possible avenues to target seniors for identity theft and similar crimes, "the question is at

least debatable," and survives rational basis scrutiny. *Clover Leaf Creamery Co.*, 449

U.S. at 464.

The parties devote substantial briefing to the question of whether union animus

against the Freedom Foundation would render the Initiative's withholding of previously

available information an illegitimate action driven by impermissible animus. Plaintiffs'

most compelling argument may be that the true, or at least primary motivation of the

Initiative's drafters and promoters was to restrict the Foundation's ability to communicate

with caregivers about their right to withhold financial support from the unions. Plaintiffs

have submitted both internal communications of union officials as well as

communications from the unions to its members.[13]  Based on this evidence and SEIU

775's loss in the state court, one could rationally infer that the predominate motivating

factor for the Initiative and the Campaign's support for the Initiative was animus toward

the Freedom Foundation and outside entities with prerogatives similar to the Foundation.

That inference leads to the conclusion that the proffered motivation of protecting seniors

was merely pretext for the true motivation of animus.  This rational conclusion, however,

---

[13] Dkt. 56-8 at 2, Email from SEIU 775 to Members ("There's one more way you can fight to stop the Freedom Foundation: When you get your ballot in the mail, vote YES on [the Initiative], which protects the private information of caregivers and our state's most vulnerable."); *id.* at 4, Email from SEIU 775 to Members ("By voting [yes on the Initiative] we protect caregivers in our union from anti-union bullying of the Freedom Foundation."); *id.* at 10–11, Email from SEIU 775 Legislative and Policy Director ("[The Initiative] initially began as legislation to look into how outside groups were using/abusing the Public Records Act to get private information of long term care workers and their clients . . . .").

is of no moment to the Court's consideration of the issues because Plaintiffs have failed

to submit any evidence that this allegedly impermissible animus "prompted the statute's

enactment." *Animal Legal Defense Fund*, 878 F.3d at 1200. The voters of Washington

enacted the Initiative, not the Washington legislature. Thus, to prove their claim,

Plaintiffs would have to show that the Washington voters harbored impermissible

animus, which Plaintiffs have failed to do, and in any case almost certainly could not do.

Instead, the text of the Initiative and the materials used to promote it to the general

public can only lead to the conclusion that the legislation received voter approval because

of the widely and legitimately promoted purpose of protecting a vulnerable population of

the state's citizens from identity theft and financial fraud. Moreover, the motivations of

the Campaign cannot render void a lawfully enacted initiative by the voters of

Washington State even if some evidence establishes that the electorate may have been

misled by the Initiative's chief proponent as to the proponent's true motivations.

Therefore, the legitimate purpose for the PRA exception survives even a searching form

of rational basis scrutiny, and the Court grants summary judgment for Defendants on

Plaintiffs' Claim Two.

In sum, the Court concludes that Plaintiffs have failed to meet their burden to

dislodge the Initiative's presumption of constitutionality.

# III. ORDER

Therefore, it is hereby **ORDERED** that the State and the Campaign's motions for summary judgment, Dkts. 48 and 47, are **GRANTED**. Plaintiffs' motion for summary judgment, Dkt. 50, is **DENIED**.

The Clerk shall enter a **JUDGMENT** and close the case.

Dated this 10th day of January, 2019.

BENJAMIN H. SETTLE
United States District Judge